IOWA SUPREME COURT BOARD OF
PROFESSIONAL ETHICS AND
CONDUCT, Complainant,

v.

Oscar E. JONES, Respondent.

No. 99–1770.

Supreme Court of Iowa.

Feb. 16, 2000.

Norman G. Bastemeyer and Charles L.
Harrington, Des Moines, for complainant.

Oscar Jones, Des Moines, pro se.

PER CURIAM.

In this attorney disciplinary proceeding,
the Iowa Supreme Court Board of Profes-
sional Ethics and Conduct charged attor-
ney Oscar E. Jones with several violations

of the Iowa Code of Professional Responsibility. The alleged violations stem from Jones' conduct in persuading a former client to loan $5000 to Jones' current client. The grievance commission recommended a reprimand. On our de novo review, we find the violations serious enough to warrant suspension.

### I. Facts.

Jones, a solo practitioner, has practiced law in Iowa for approximately forty-seven years. He has a general practice, consisting of personal injury work, family law, probate, and real estate.

In 1995 Leon Currie of Waterloo, Iowa, contacted Jones. Before this time, Jones had never represented Currie, nor did he know him.

Currie told Jones that he had negotiated a contract with the Nigerian National Petroleum Company to build a pipeline in Nigeria. He also told Jones that he had completed his end of the contract, but had yet to be paid what was owed him—$25,300,000.

Currie told Jones he needed $25,300 to pay for risk insurance for delivery of the $25,300,000. He also told Jones he had obtained most of the $25,300 for the premium, but was short $5000. Currie asked Jones to find a lender to cover this remaining amount. Currie agreed to purchase a two million dollar annuity for Jones if Jones were successful in securing a lender and obtaining payment of the $25,300,000.

Jones did not try to independently verify Currie's story. Instead, he accepted Currie's story at face value.

Currie told Jones that American banks wanted no part of any activities concerning Nigerian ventures because the banks considered such ventures "quite risky." Several banks that Jones contacted confirmed Currie's statement. Jones then tried, unsuccessfully, to borrow the $5000 from several individuals, but they were not interested.

On Saturday, May 17, 1997, Jones contacted Delbert Jones (no relation). Jones has known Delbert for over thirty years, and according to Jones, Delbert "liked to venture into things like this as long as he was satisfied that he could make some money off of it." Jones had represented Delbert in a divorce more than twenty years before but was not representing him at the time of the call. Delbert, a carpenter, is seventy-four years old with a high school education.

Jones told Delbert that Currie was due money on a pipeline contract but needed to pay an insurance premium before receiving payment. Jones told Delbert that, if he, Delbert, loaned Currie $5000 within two days to pay the premium, Currie would repay Delbert $15,000 within thirty days. Jones described the venture as an opportunity "to make some fast money . . . some good money."

In explaining the purpose of the loan, Jones showed Delbert two letters. One letter, dated March 7, 1997, was addressed to Currie and purportedly came from the Nigerian Deposit Insurance Co., Ltd. The letter stated that the company was prepared to issue Currie risk insurance "for delivery of your funds" in the amount of $25,300,000. The letter also stated that the company's liability to Currie

> commences upon receipt of your commitment of U.S. $25,300, and we guarantee that your funds will be remitted to you insured in conjunction with the Federal Ministry of Finance as soon as we receive your payment confirmation through our established service channel.

The other letter, dated March 26, 1997, purportedly came from the director of investigations for the Federal Republic of Nigeria. The letter was not addressed to anyone but purported to be a "Letter of Clearance and Confirmation of Funds." The letter stated that the director had "thoroughly investigated the source of the sum of U.S. $25.3 million belonging to Mr. Leon Currie as proceeds due for a contract executed in Nigeria in 1985." The letter

also stated that "[t]he payment is not for laundering or drug business. You may accept the funds in the beneficiary's account as it has been certified genuine and incontroversial [sic]."

Delbert asked Jones why he could not make the loan. Jones replied, "I can't do that. He's my client." Jones never told Delbert that banks and other individuals had refused to loan money for the endeavor or that the transaction was risky. Nor did Jones tell him that, if Jones successfully secured the $5000 loan and the contract money, Currie would purchase for Jones a 2 million dollar annuity. When Delbert commented that he did not know Currie, Jones replied, "Well, he's my client. He's good. He's good."

Delbert trusted Jones, and based on Jones' representations that the endeavor was sound, Delbert borrowed $5000 for thirty days from his credit union and obtained a cashier's check in that amount payable to Jones. Delbert delivered the check to Jones, who endorsed it and forwarded it to Currie. When Delbert commented that he had no guarantee of repayment, Jones signed on Currie's behalf, a handwritten, thirty-day promissory note payable to Delbert.

Not surprisingly, Delbert has not received any money from the transaction, and according to Jones, Currie is in poor financial condition. The credit union gave Delbert two thirty-day extensions on his $5000 loan. At the end of ninety days, Delbert paid the loan together with interest at nine percent.

## II. Proceedings.

The board filed a complaint against Jones, alleging misconduct on his part arising out of the $5000 debt that Delbert incurred. The complaint charged that Jones had violated Iowa Code of Professional Responsibility for Lawyers DR 1–102(A)(4) (lawyer shall not engage in conduct involving misrepresentation); DR 1–102(A)(6) (lawyer shall not engage in conduct reflecting adversely on fitness to practice law); and DR 7–102(A)(7) (lawyer shall not counsel or assist client in conduct that lawyer knows to be illegal or fraudulent). Jones responded to the board's requests for admissions and later appeared at a hearing on the matter before the grievance commission. Jones and Delbert were the only witnesses the commission heard.

Following the evidentiary hearing, the commission filed its findings of fact, conclusions of law, and recommendation of discipline. The commission noted that there was no evidence that Jones knew— at the time of requesting the loan—that the Nigerian transaction was fraudulent. Based on this lack of evidence, the commission found that Jones had neither assisted nor counseled Currie in the commission of a fraud and had not himself otherwise engaged in fraudulent activity. The commission therefore concluded that the board had not proven a violation of DR 7–102(A)(7).

However, the commission did find that Jones' actions and omissions in obtaining the $5000 loan from Delbert constituted a misrepresentation. The commission therefore concluded that the board had proven a violation of DR 1–102(A)(4) and DR 1–102(A)(6). The commission recommended a public reprimand.

## III. Scope of Review and Burden of Proof.

Jones has not appealed from the commission's recommendation under Court Rule 118.11. Nevertheless, we review the record de novo. Ct. R. 118.10. We give respectful consideration to the commission's recommendations. We, however, ultimately decide what discipline is appropriate under the unique facts of each case. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Beckman*, 557 N.W.2d 94, 95 (Iowa 1996).

The board must prove its allegations of lawyer misconduct by a convincing preponderance of the evidence. *Id.* This

burden of proof is greater than in a civil case but less than in a criminal case. *Id.*

## IV. The Violations.

■ **A. DR 7–102(A)(7) (lawyer shall not counsel or assist client in conduct that lawyer knows to be illegal or fraudulent).** Like the commission, we find the record does not establish that Jones (1) knew that the Nigerian transaction was fraudulent and (2) intended to deceive Delbert. In fact, there is no evidence that the transaction is fraudulent other than that the story sounds incredible.

Jones continues to believe the funds will be forthcoming. He testified that the funds are currently tied up in Chicago and that he had documentation to prove it. The problem, however, is that Jones did not present any such documentation. (The commission offered to recess so Jones could produce the documentation. Jones, however, declined the offer.) Nor did he have Currie at the hearing to explain the transaction and to verify the funds were in Chicago and would be forthcoming. Jones' failure in this regard troubled the commission, and it troubles us too.

Nevertheless, we think what we have here is not an attorney who intended to deceive but an attorney who naively believed the "pie in the sky" story that Currie handed him. Perhaps the allure of the two-million-dollar annuity blinded Jones' judgment. Delbert himself believed Jones had not intended to deceive him. He testified: "Well, [Jones has] always been an honest fellow to me as long as I've known him. I never known him to do anything wrong. I don't think [Jones] thought this would happen. I think he thought like I did—that the man was coming through." We therefore agree with the commission that the board failed to prove a violation of DR 7–102(A)(7).

■ **B. DR 1–102(A)(4) (lawyer shall not engage in conduct involving misrepresentation) and DR 1–102(A)(6) (lawyer shall not engage in conduct re-flecting adversely on fitness to practice law).** Jones claimed he was acting not as a lawyer but as a business or investment adviser. There are two problems with this assertion. First, the assertion is not entirely accurate. Although Delbert was not a client of Jones at the time, Currie was Jones' client. Second, such an assertion has little significance for our purposes because lawyers do not shed professional responsibilities in their personal and business transactions. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hansel,* 558 N.W.2d 186, 188–89 (Iowa 1997) (finding misconduct in lawyer's farm loan dealings with bank).

■ In a business transaction with an unrepresented person, an attorney's failure to recognize and correct potentially misleading situations is unethical even though the lawyer has no intent to deceive. *Committee on Prof'l Ethics & Conduct v. Wunschel,* 461 N.W.2d 840, 847 (Iowa 1990). We find that under the circumstances Jones' statements and omissions went beyond potentially misleading Delbert—they did mislead him and caused him to make the loan.

Jones was aware that Delbert had no experience in the kind of venture Jones was describing to him and that Delbert did not know Currie. Given the longtime friendship and trust between the two, Jones knew Delbert's decision whether to make the loan would depend on Jones' representations to him. In fact, Delbert testified he told Jones as much: "I said, 'Okay.' I said, 'I don't know [Currie], but I'll make the loan because I know you, and I know you're going to do right by me. You always have done right by me.'" Delbert further testified that he made the loan because Jones assured him that Currie was "good" for the money and promised he—Delbert—would make a $10,000 profit.

Jones knew the venture was risky. He should have conveyed this information to Delbert, an obviously unsophisticated and elderly gentlemen. At the very least, he

should have explained to Delbert that American banks had refused to loan money for the insurance premium because of concern over the stability of the Nigerian government and fraudulent transactions coming out of that country. Jones should also have told Delbert about the several other individuals who indicated they were not interested in making the loan. Finally, Jones should have told Delbert about Currie's promise of a $2 million annuity if Jones were successful in securing a lender and obtaining payment of the $25,300,000. The record clearly shows that, while Delbert may not have looked to Jones for legal advice, he clearly looked to him for protection.

What also concerns us is the urgency for the loan. Jones should not have rushed Delbert into making a decision during two weekend days, thereby depriving Delbert of any real opportunity to seek outside advice.

We agree with the commission that Jones' misstatements and omissions constituted misrepresentation in violation of DR 1–102(A)(4) and reflected adversely on his fitness to practice law in violation of DR 1–102(A)(6).

## V. Discipline.

■ The commission gave no reason for its recommendation of public reprimand. While we give respectful consideration to the findings and recommendations of the commission, we disagree with the commission's recommendation in this case.

In the past, we have publicly reprimanded Jones, and we take that into consideration in imposing discipline. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wagner*, 599 N.W.2d 721, 730 (Iowa 1999) (holding that prior discipline is an aggravating factor). We also take into consideration that Jones' conduct caused Delbert harm. *See id.* (holding that harm is an aggravating factor).

These aggravating factors together with the nature of the present violation con-vince us that the appropriate discipline is suspension. We therefore suspend Jones' license to practice law in this state with no possibility of reinstatement for two months from the filing date of this opinion. This suspension shall apply to all facets of the practice of law. *See* Ct. R. 118.12. Any application for reinstatement shall be governed by Court Rule 118.18. As a condition of reinstatement, Jones shall make restitution to Delbert for the amount of the $5000 loan and all interest Delbert has paid in connection with the loan.

Costs are assessed to Jones under Court Rule 118.22.

**LICENSE SUSPENDED.**

All justices concur except LAVORATO, LARSON, and NEUMAN, JJ., who dissent.

LAVORATO, Justice (dissenting).

I dissent because I think for several reasons the discipline in this case is too severe.

First, we have a lawyer here who has been in practice for forty-seven years. Except for a previous reprimand, his record is unblemished. The public reprimand occurred in 1986 for a minor probate delinquency, conduct totally unrelated to what was charged here. *See Committee on Prof'l Ethics & Conduct v. Wunschel*, 461 N.W.2d 840, 848 (Iowa 1990) (imposing reprimand even though lawyer had previously been reprimanded for probate delinquency). I think we can assume therefore that what occurred here was an isolated incident of misconduct, something that was out of character for Oscar Jones and therefore not likely to reoccur.

Second, Delbert testified that he filed this complaint, not because he thought Oscar had defrauded him, but because Delbert thought the complaint would result in a return of his money. Had Oscar paid Delbert back, this case would never have seen the light of day.

Third, what we have here is a scam perpetrated, not by Oscar, but by Currie.

In a sense, Oscar was just as much a victim as Delbert. Both Delbert and Oscar naively believed Currie would come through.

Fourth, Delbert was not as unsophisticated as the majority paints him out to be. I think it is clear from the record that Delbert was no novice when it came to risky ventures in which he could make some "fast money."

Fifth, Oscar cooperated fully from the beginning. After Delbert filed a complaint with the Polk County Bar Association Grievance Committee, Oscar wrote a lengthy letter setting out the details surrounding the transaction. He also cooperated with the Board of Professional Ethics and Conduct after Delbert's complaint was forwarded to it.

Sixth, at the disciplinary hearing Oscar made no lame excuses for his actions. He admitted all the details of the transaction. He told the commission that, if his actions were wrong, he was ready to accept whatever punishment the commission thought was appropriate. His only denial was to the claim that he had defrauded or aided Currie in defrauding Delbert.

Last, I think the misconduct here is no more egregious than what occurred in *Wunschel,* a case in which we only reprimanded the attorney, who had been practicing law for thirty-five years. *Id.* at 848. The commission had recommended a six-month suspension, a recommendation the lawyer on appeal claimed was "unduly severe." *Id.* at 844, 848.

As we said in *Wunschel,* "the case presents a lesson in how a prudent lawyer ought not to act when consummating a $2 million real estate transaction with strangers who appear to be unrepresented by counsel." *Id.* at 841. In finding that the attorney violated DR 1–102(A)(4) by engaging in conduct amounting to misrepresentation, we said:

> Nevertheless, substantial evidence in the record supports the Commission's conclusion that Wunschel misled the Noyes "into passive trust . . . to secure an unfair gain for himself." Interpreting DR 1–102(A)(4) in its broadest

sense, Wunschel effectively misrepresented his role in this transaction. Even absent an intent to deceive, an attorney's failure to recognize and correct potentially misleading situations is unethical. Given the size and complexity of the transaction, and his personal stake in it, Wunschel should have bent over backwards to assure that the Noyes had someone looking out for their interest. He did not do so. Instead, he at best kept silent on the question of whether the Noyes should seek independent counsel. Like the Commission, we infer from the record that Wunschel perceived a personal advantage in the Noyes' ignorance.

*Id.* at 847–48.

It is beyond me how in *Wunschel* we could reject a commission's recommendation of a six-month suspension in favor of a reprimand, and in Oscar's case, which I think is no more egregious, we reject a commission's recommendation of reprimand in favor of a two-month suspension. To me there is something not quite right about this picture.

Oscar testified he was retiring. He was operating out of his home in the process of winding down his practice. We should let this lawyer retire without besmirching an almost unblemished record of forty–seven years with the type of discipline that I feel is unjustified.

I agree with the commission's recommendation of a reprimand, and that is what I would impose. However, I would strongly suggest to Oscar that he pay Delbert the $5000 and the interest he incurred. However innocent Oscar might think his actions were, the fact remains that, but for his representations and omissions, Delbert would probably have said he was not interested either.

LARSON and NEUMAN, JJ., join this dissent.