**IOWA SUPREME COURT BOARD OF PROFESSIONAL ETHICS AND CONDUCT, Complainant,**

v.

**Mark S. BECKMAN, Respondent.**

No. 03–1101.

Supreme Court of Iowa.

Jan. 22, 2004.

Norman G. Bastemeyer and David J. Grace, Des Moines, for complainant.

Mark S. Beckman, Dubuque, pro se.

TERNUS, Justice.

The Iowa Supreme Court Grievance Commission has filed a report with this court recommending that we revoke the respondent's license to practice law based on the Commission's finding that the respondent has again committed multiple violations of the Iowa Code of Professional Responsibility for Lawyers. We agree with this recommendation.

The respondent, Mark S. Beckman, has received ample warning—in the form of prior discipline—that his conduct must conform to the ethical standards governing his chosen profession. Despite these warnings, he has failed to modify his behavior. We surmise from his current infractions that he is unable or unwilling to do so. The respondent has demonstrated that he is unfit to serve as an attorney. Therefore, we revoke his license to practice law in this state.

I. *Scope of Review.*

This matter is before the court for review of the Commission's report and for final disposition of the charges lodged against the respondent by the Iowa Su-

preme Court Board of Professional Ethics and Conduct. *See* Iowa Ct. Rs. 35.9, .10(1). The Board bears the burden to prove the alleged ethical violations by a convincing preponderance of the evidence. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Kallsen,* 670 N.W.2d 161, 164 (Iowa 2003).

■ We review the Commission's report de novo. *See* Iowa Ct. R. 35.10(1). Under this standard of review, we give weight to the factual findings of the Commission, especially with respect to witness credibility, but we find the facts anew. *See Kallsen,* 670 N.W.2d at 164. Similarly, while we give respectful consideration to the Commission's recommended discipline, this court must decide upon the appropriate sanction. *Id.*

II. *Factual Findings.*

A. *Background.* Mark Beckman graduated from law school in 1976 and was admitted to practice law in Iowa that same year. In 1979 he settled in Dubuque, Iowa and has practiced law in that community ever since. His legal career has not been without blemish. In 1991, Beckman's license was suspended because he failed to make the required annual filings with the Client Security and Attorney Disciplinary Commission and the Commission on Continuing Legal Education. *See* Iowa Ct. Rs. 39.8, 41.4. Although the required forms were eventually filed and Beckman's license was reinstated, his disciplinary history was only in its infancy.

Beginning in 1992, Beckman accumulated no less than five public reprimands and another suspension. On April 10, 1992, he was reprimanded for distribution of a direct mail advertisement that violated the Iowa Code of Professional Responsibility for Lawyers in five different particulars. He was reprimanded for a similar type of infraction on July 13, 1995. On July 18, 1996, Beckman was reprimanded for failing to deposit a $500 cash advance in a trust account, for falsely stating on his Client Security Combined Statement and Questionnaire that he kept all funds of clients in trust accounts, and for permitting his trust account to incur a shortage. Later that year, in December 1996, we suspended Beckman's license for three months because he violated the disciplinary rules governing lawyer advertising and made a false statement to the Iowa Supreme Court Grievance Commission. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Beckman,* 557 N.W.2d 94, 96–97 (Iowa 1996) (finding Beckman violated the attorney advertising rules by sending a marketing letter to nonclients without the required disclosure and then falsely told the Commission that the recipients were his current clients when the letter was sent). Not even a year later, he was publicly reprimanded on September 12, 1997, for two separate ethical violations: (1) he failed to notify a client with a pending legal matter of his suspension from the practice of law; and (2) he again deposited a $500 retainer into his office account rather than into his trust account. Beckman's most recent public reprimand occurred in April 1999 when he was sanctioned for advertising that he practiced primarily in domestic relations and family law without having certified his eligibility to do so as required by our advertising rules.

That brings us to the current proceeding, which involves Beckman's representation of four different clients. We will summarize our factual findings with respect to each matter separately and then briefly review Beckman's explanations for his conduct.

B. *Roling estate.* Beckman was employed in September 1997 to assist Marjorie Roling in probating the estate of her deceased son. Beckman opened the estate

that month and worked with Roling, who served as the estate administrator, to publish notice to creditors and pay debts owed by the estate. On November 3, 1997, less than two months after the estate had been opened, Beckman presented a bill for services rendered to Roling, who then issued a check to Beckman in the sum of $1282. Beckman deposited these funds in his office account.

After Beckman was paid, he did very little work on the estate for nearly three years. Roling became increasingly anxious to have the matter concluded. In May 2000, the clerk of court sent a notice of delinquency, prompting Roling to make numerous calls to Beckman in an effort to get him moving forward on the estate. Roling was finally able to meet with Beckman for several minutes in his office on June 8, 2000. At that time, she provided him with all the documentation and information she had. Thereafter, she continued to write and call Beckman, vainly urging him to wrap up the probate proceeding. On June 30, 2000, Beckman obtained an extension of the delinquency deadline to September 29, 2000. On the latter date, Beckman orally requested a second extension. In view of the prior extension, the court set the matter for hearing on October 11, 2000, stating that "[b]oth Attorney Beckman and Ms. Roling shall be present at that hearing." The clerk sent a copy of the court's order to Roling. Roling then wrote to the clerk of court, reviewing her dealings with Beckman, including her payment of attorney fees, and complaining about his delay in finalizing the estate.

When the district court judge assigned to hear Beckman's request for an extension reviewed the file in preparation for the hearing, she discovered Roling's letter and learned that Beckman had already been paid more than $1200 for his work on the estate. The judge could find no application for compensation and no court order allowing attorney fees as required by the Iowa Code and our court rules. *See* Iowa Code § 633.198 (1999); Iowa Ct. R. 7.2. In addition, she verified that the inheritance tax return had not yet been filed, nor had a tax clearance been issued, such being a necessary predicate to the allowance of fees. *See* Iowa Ct. R. 7.2(4).

At the time for the scheduled hearing, Beckman and Roling were present. The court took the opportunity to ask Beckman how he had come to be paid already for his work. Beckman told the judge that he had taken the payment as a retainer, and he led the court to believe he had deposited the funds in his trust account. The court ordered the immediate return of the payment to Roling, who indicated she preferred that Beckman put a check in the mail rather than hand deliver the refund to her. The court specifically instructed Beckman that he would have to make an application for his fees and secure a court order approving them, as required by statute. Subsequently, the judge reported Beckman's misconduct to the Board of Professional Ethics and Conduct.

The next day Beckman personally delivered a check for $1282 to Roling. At the same time, he presented to her another statement for services rendered in the amount of $1970. Roling paid this sum to Beckman and he deposited the funds in his office account. Beckman had not made application to the court for authorization of this payment; he had not obtained a court order approving his fees; and he had not yet secured an inheritance tax clearance from the Iowa Department of Revenue.

In the written order entered after the October 11 hearing, the court scheduled a status review hearing for later that month. This order was sent to Beckman and Roling, and stated: "The status of this case

will be reviewed by the Court with the administrator and Attorney Beckman on the 27th day of October, 2000." On October 17, Beckman sent Roling an affidavit to sign, verifying his return of the $1282 payment. The affidavit made no mention of Roling's $1970 payment. After receiving this letter Roling spoke with Beckman by phone. He told her she did not need to attend the hearing on the 27th. When she pointed out that the notice specifically stated the matter would be reviewed with the "administrator," Beckman told her that reference was to the court administrator, not the estate administrator. Roling was skeptical and attended the hearing anyway.

At the October 27 hearing, the presiding judge learned that Beckman had again taken advance fees. Noting Beckman was no more entitled to the second payment than he was to the first payment, the court ordered him to refund the $1970 payment to Roling within seven days. Once again Beckman was admonished that he was not to take fees "to be held in escrow" and that payment of attorney fees must await approval of the final report. In addition, the court pointed out that the amount of attorney fees had not been calculated correctly. Finally, the court noted several deficiencies remaining in the estate and he gave Beckman thirty days to complete the necessary tasks. Subsequently, the estate was closed and attorney fees in the amount of $1749 were approved.

C. *Simon criminal matter.* In August 2000, Beckman was retained by Carl Simon to represent Simon with respect to several criminal charges. On August 7, 2000, Simon turned himself in to the authorities and was jailed. At Beckman's request, Simon's wife paid Beckman a $2200 cash retainer that morning. Beckman did not deposit these funds in his trust account. Beckman appeared at Simon's initial appearance on the morning of August 7, and assisted Simon's wife in arranging for Simon's release on a $15,000 cash bond. Simon got out of jail shortly after 2:00 p.m. on August 7 and went to Beckman's office later that day. Beckman had already left on vacation for the rest of the week and Simon was unable to reach him.

Simon employed another attorney, Dan McClean, on August 10. McClean wrote to Beckman that day, telling Beckman that he—McClean—was now representing Simon and asking Beckman to return any unused retainer. Nonetheless, Beckman appeared at Simon's arraignment on August 21, 2000, claiming he thought he still represented Simon. With McClean's assistance, Simon eventually pled guilty to reduced charges.

Beckman did not return any portion of the retainer, despite a second written request from McClean on February 7, 2001. Simon finally sued Beckman in small claims court. At the trial of that action, Beckman produced an accounting that showed he had spent enough time on Simon's case to justify a $2200 fee. He claimed he had mailed this statement to Simon on August 26, 2000, but Simon denied having received it. Beckman's fee statement included numerous entries for August 7, 2000, which added up to nearly twelve hours of work on that day alone. The magistrate hearing the case rejected Beckman's fee statement, finding it "incredulous ... that $2200 could be spent between the time [Simon] was incarcerated, released and arraigned." She concluded Beckman was entitled to be paid for only two hours of work. She entered a judgment against Beckman for all but $250 of the retainer.

Simon also reported his complaints concerning Beckman to the local bar association on October 11, 2000. The chair of the

local ethics committee wrote to Beckman on two occasions, asking that he respond to Simon's complaint. Beckman did not make a timely reply to either request.

D. *Kilby estate.* In September 2000, Beckman was retained by Jean Kilby to assist her in probating her husband's estate. As in the Roling estate, Beckman collected $2500 in fees without court approval shortly after opening the estate. He then deposited these unearned fees in his office account. Thereafter, Beckman did little work on the estate, causing Kilby, the executor, to seek other representation.

In January 2001, Kilby hired another lawyer, John C. O'Connor, to complete the necessary work. O'Connor wrote to Beckman in late January, informing Beckman that O'Connor was now representing Kilby. In response, Beckman wrote to O'Connor, enclosing a letter dated October 12, 2000, addressed to Kilby, in which Beckman returned the $2500 retainer. In addition, Beckman enclosed a check for $2500 that also bore an October 12, 2000, date. In the cover letter to O'Connor, Beckman explained that he had written the letter to Kilby in October, but had inadvertently failed to mail it. O'Connor gave the enclosed check to Kilby on February 9, 2001.

Despite the fact the estate was uncomplicated, O'Connor found that Beckman had not filed anything in the probate proceeding after the estate was opened. When O'Connor obtained Beckman's file, he discovered that an inventory prepared by Beckman included real estate that was owned by the executor, not the decedent. This error had a significant inflationary effect on the maximum statutory attorney fees that would be allowable. In addition, Beckman had prepared a federal tax return showing attorney fees of $2077 and fiduciary fees of $2077. Of course, the attorney fee figure was incorrect, as Beck-

man had already been paid $2500. In addition, it was inappropriate to have Kilby take a fiduciary fee, upon which she would have to pay income tax, when she was the only beneficiary of the estate and would have received the estate assets in any event. O'Connor finally closed the Kilby estate in early June 2001, and received fees at the statutory rate of $782 plus expenses.

E. *Clyde Harper dissolution.* Beckman represented Clyde Harper in a dissolution action in 1999. Harper paid Beckman a $1000 retainer and then paid Beckman's later bills of $320, $664, and $224. In August 1999, just before trial, Harper paid Beckman another $800 by check, with a notation "attorney fees in full."

Harper was dissatisfied with the court's subsequent judgment, and on September 15, 1999, he paid Beckman an additional $2700 to pursue an appeal. This check included a notation, "fees in full," indicating the $2700 payment was to fully compensate Beckman for his time on the appeal. Beckman did not place these funds in his trust account.

Thereafter, Beckman filed a notice of appeal but never prepared an appendix or a brief. For a short period of time after the notice of appeal was filed, Harper attempted to negotiate a settlement with his former wife. These efforts proved unsuccessful, however, and Harper then wanted the appeal pushed forward.

Harper eventually became frustrated with Beckman's lack of work on his case and in January 2000 hired different counsel to pursue the appeal. At that time, Beckman had not sent any statements to Harper showing any services rendered on the appeal. Harper called Beckman on January 20, 2000, to inform him that his services were no longer needed. The

same day Beckman wrote a letter to Harper, with a copy to Harper's new attorney, painting Harper as an uncooperative client. He closed the letter with the following statement: "Thank you for the compliment that you gave me on January 20, 2000 that you're [sic] seeking a change of attorneys relative to this appeal had nothing to do with my handling of the case. Such is greatly appreciated."

This letter was very upsetting to Harper, who felt compelled to respond. He wrote a letter to Beckman on February 2, 2000, expressing his resentment at Beckman's inaccurate characterization of what had occurred. He also corrected Beckman's false portrayal of the reason Harper sought other counsel, asserting that it was precisely because of his dissatisfaction with Beckman that he changed attorneys. Finally, Harper requested an accounting and a refund of any unearned portion of the appeal retainer.

Harper received no response to his letter, so he called Beckman on April 14, 2000, asking about a refund. Despite assurances from Beckman that he would "take care of it," he did not. Harper wrote to Beckman again on June 2, 2000, renewing his request for a refund of the unearned retainer.

When Harper still did not receive a refund, he contacted the local bar association to lodge a complaint against Beckman concerning Beckman's refusal to provide an accounting and a refund. After being notified of Harper's complaint, Beckman wrote to the bar representative looking into the matter, and enclosed an April 19, 2000, letter from Beckman to Harper. In the enclosed letter, Beckman purported to provide an accounting to Harper, showing unpaid charges totaling $4016, including time spent on the district court proceedings, against which Beckman credited the $2700 retainer. Beckman claimed that he

did not owe Harper a refund. Harper adamantly denied receiving Beckman's April 19, 2000, letter or the enclosed statement until the local bar forwarded copies to him. He also claimed all fees for Beckman's services in the district court proceeding had been fully paid prior to Beckman's receipt of the $2700 retainer.

Harper sued Beckman in small claims court, seeking to recover the unearned portion of the $2700 payment. This case eventually settled for a $1350 refund.

F. *Beckman's response to disciplinary charges.* Beckman testified at the hearing on the Board's complaint. The Commission found him "less than credible." We have reviewed the transcript of the hearing and the numerous exhibits, and we conclude the Commission's characterization is charitable. Beckman lied to his clients and the Commission to cover up his transgressions. He manufactured and backdated correspondence to justify his actions and hide his ethical violations. Because we find Beckman's efforts to conceal and justify his actions reflect serious character flaws and indicate the unlikelihood of rehabilitation, we highlight some of the testimony given by Beckman at the hearing.

1. *Roling estate.* Despite a statement on the October 1997 bill to Roling that "[p]ayment in full is due upon receipt of the statement," Beckman claimed at the hearing that his first bill for $1282 was "an informational billing only." He admitted, however, that when the payment came in, he intentionally deposited it, "honestly [thinking he] could take that money and keep it in the retainer and apply it towards attorney fees." This assertion was undermined by evidence showing Beckman had handled two prior estates in the early 1990s and had properly requested fees at the conclusion of the matter. In addition, the Board introduced a letter from Beck-

man to ethics counsel in the current proceeding wherein Beckman asserted "[t]he $1282 was *inadvertently* deposited upon receipt." (Emphasis added.) When confronted with his letter at the hearing after having testified that he intended to deposit the check when he received it in 1997, he explained that he merely meant in his later letter that he had "no intention of keeping and cashing the funds."

Beckman claims to have deposited the first payment of $1282 in his trust account in 1997, yet he had no documentation supporting this claim, explaining that he had discarded his old records. When reminded that our rules require that such records be kept for six years, he denied knowing of such an obligation. During his testimony, he was confronted with trust account records from October 2000 showing a $1282 deposit just prior to his issuance of a refund check to Roling in that amount on October 13. He explained that he changed banking institutions for his trust account and the October 2000 deposit of $1282 must have been a transfer from his old trust account. When asked why he had no records from the old trust account covering October 2000, he theorized that he must have closed that account in October 2000, and thrown away the records.

Beckman characterized his later acceptance of the $1970 payment as an "act of stupidity." He admitted he did not deposit this payment in his trust account. He asserted he "was not aware" that he was required to do so. This explanation rings hollow, however, in view of the fact Beckman was disciplined in 1996 and again in 1997 for failing to deposit advance fees in his trust account.

Beckman also disputed the charge he did no work on the Roling estate after receiving the initial fee payment of $1282. When reminded that his later billing in October 2000 showed a substantial period of time with no time entries, he claimed "there's a lot of times, I just don't bill clients for time spent," especially when, as here, he thought his time would exceed the allowable fees.

2. *Simon criminal matter.* Beckman claims he did not put Simon's $2200 cash retainer in his trust account because he thought Simon might need some portion of the funds back, either to fund the $15,000 cash bond or to finance Simon's farming operation. Beckman acknowledged that "[i]n retrospect," he could have put the money in his trust account and written a check to Simon had Simon needed some of the funds later.

Beckman asserted that he had no knowledge that he had been fired as Simon's attorney and that is why he allegedly continued to work on Simon's case after returning from vacation. He said he did not receive attorney McClean's letter notifying him that his representation had been terminated, probably because he had changed offices around this time and the letter was sent to his old address. Beckman admitted, however, that he had simply moved across the street, and McClean testified that the letter was never returned to him. In addition, Beckman does not dispute that he received McClean's second letter of February 7, 2001, asking for a refund of the retainer, which had also been sent to Beckman's old office address.

Beckman's denial of any knowledge of McClean's representation of Simon was also challenged by Beckman's possession of McClean's appearance filed on August 14, 2000. When Beckman produced his office file during the ethics proceeding, it contained a copy of McClean's appearance. When confronted with this document in his own file, Beckman claimed that he had understood ethics counsel's request to be for the Simon *court* file, not Beckman's office file. Consequently, Beckman said,

he obtained the court file and included that in the documents produced. Again, Beckman's explanation is unpersuasive given that the request for production filed by ethics counsel in this disciplinary proceeding requested "[*r*]*espondent's* file regarding State v. Carl Simon." (Emphasis added.)

Beckman was also asked about the absence of any memorandums in his office file on the Simon matter, despite multiple references in his bill to the preparation of memorandums to the file. Beckman testified that the "memorandums" were actually detailed time slips explaining what he had done on the file. Once the bill was prepared, the time slips were discarded, Beckman explained, and that was why no memorandums appeared in the file.

With respect to Beckman's failure to respond to inquiries from the local ethics committee, Beckman testified that he prepared a response, but it was never mailed due to turnover in his office staff. He claimed he did not realize his response had not been sent until he found his letter to the local committee in the file two months later after the matter had been reported to the Board.

3. *Kilby estate.* Beckman claimed the $2500 "retainer" paid by Kilby was "inadvertently" deposited in his office account. He contended he attempted to refund this fee on October 12, 2000, once he learned in the Roling matter that such advance fees were improper. He claimed the letter and refund check from his trust account bearing that date were not sent then due to a change in secretaries. He explained that at that time he had recently separated from his prior firm and was experiencing difficulties in starting a solo practice.

Beckman confirmed that his bank statements at the time the refund check was allegedly written—October 2000—showed a balance of less than $20. In addition, his bank records showed a deposit of $2500 just prior to his letter of February 9, 2001, to attorney O'Connor, in which he forwarded the "recently discovered" refund check in the same amount. Without the $2500 deposit, there would not have been sufficient funds in the account to cover the check to Kilby. The bank records also showed that the check number on the refund check—1027—corresponded to the numbers on checks written in February 2001, and was a higher number than checks written in October 2000, which were 1010 through 1012. Notwithstanding this evidence, Beckman steadfastly maintained that he had written the refund check and cover letter to Kilby in October 2000, as soon as his problems in the Roling estate arose.

4. *Harper dissolution.* Beckman admitted he did not deposit Harper's $2700 retainer in his trust account, asserting that he had already earned it by the time he received the check. He disputed that this payment was intended to cover the entire appeal. He again attributed the tardiness of his accounting to "secretarial turnover."

### III. *Ethical Violations.*

With respect to Beckman's handling of the Roling estate, we find he violated Iowa Code of Professional Responsibility DR 6–101(A)(3) ("A lawyer shall not . . . [n]eglect a client's legal matter."). We do not believe Beckman worked on the estate from November 1997 through October 2000, but simply did not bill his client for his time. To the contrary, we think Beckman failed to undertake the work necessary to close this estate until it was delinquent and his client had contacted the clerk of court. This neglect was made more egregious by his premature collection of fees. The $1282 and $1970 payments were received in violation of Iowa Code section 633.198 and

Iowa Court Rule 7.2, and constituted a violation of DR 2–106(A), which prohibits the collection of an illegal fee. The second payment was particularly blatant, given the district court's prior admonition to Beckman that he must make application to the court and obtain an order approving his fees prior to payment. Moreover, Beckman sought to hide the second payment from the court by advising his client that she did not need to attend the status hearing and misrepresenting to her that the court intended to involve the court administrator, rather than the estate administrator, in the hearing. In addition, Beckman lied about his billing and collection of the $1282, trying to characterize his collection of the fees as accidental, when in fact it was not. He also lied about depositing this payment in his trust account. These actions violated DR 1–102(A)(1) ("A lawyer shall not . . . [v]iolate a disciplinary rule."), (4) "A lawyer shall not . . . [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."), (5) ("A lawyer shall not . . . [e]ngage in conduct that is prejudicial to the administration of justice."), and (6) ("A lawyer shall not . . . [e]ngage in any other conduct that adversely reflects on the [attorney's] fitness to practice law."), as well as DR 9–102(A) ("All funds of clients paid to a lawyer . . . shall be deposited in one or more identifiable interest-bearing trust accounts . . . .").

■ With respect to the Simon matter, Beckman again violated DR 9–102(A) by failing to deposit the $2200 retainer in his trust account. After being discharged by Simon, he failed to withdraw from the case, as required by DR 2–110(B)(4). Thereafter, he failed to render a timely accounting and did not return the unearned portion of the retainer until he was sued, all in violation of DR 9–102(B)(3) and (4). In addition, his billing was fraudulent

and excessive, violating DR 1–102(A)(4) and DR 2–106(A). Finally, Beckman violated DR 1–102(A)(5) and (6) when he failed to cooperate with the local ethics committee investigating Simon's complaint.

■ With respect to the Kilby estate, Beckman knowingly retained an illegal fee collected in violation of the Iowa Code and our court rules. This conduct violated DR 2–106(A). Again, Beckman did not keep these funds in his trust account, a violation of DR 9–102(A), and he later manufactured evidence in an attempt to document a refund of the illegal fee, a violation of DR 1–102(A)(4).

■ With respect to the Harper dissolution, Beckman did not deposit his client's retainer in his trust account, contrary to DR 9–102(A). After his discharge, he failed to refund the unearned portion of the retainer until sued by his client in violation of DR 9–102(B)(4).

IV. *Appropriate Discipline.*

■ In determining the appropriate discipline, this court will consider the following factors:

> the nature and extent of the respondent's ethical infractions, his fitness to continue practicing law, our obligation to protect the public from further harm by the respondent, the need to deter other attorneys from engaging in similar misconduct, our desire to maintain the reputation of the bar as a whole, and any aggravating or mitigating circumstances.

*Kallsen,* 670 N.W.2d at 164. Our consideration of these factors leads to the inescapable conclusion that revocation of Beckman's license to practice law in this state is warranted.

Beckman's ethical infractions are numerous and serious. Most problematic is the intentional and knowing nature of his violations. Beckman was reprimanded in

1996 and again in 1997 for failing to deposit client funds into his trust account, yet he continued this unethical practice in the matters before us here. Similarly, despite having handled estate matters in the past and taking fees only after court approval, he collected fees prematurely in the Roling and Kilby estates. The boldness of his second collection of fees in the Roling estate on the very day he refunded the first payment under court order is particularly reprehensible and leaves no doubt that his actions were knowingly wrong and not the product of mere oversight. This conclusion is strengthened by Beckman's numerous acts of deceit in the matters at issue here, a trait we have documented previously. *See Beckman*, 557 N.W.2d at 96 (suspending Beckman's license, in part, due to his making of a false statement to the Commission). Beckman's pattern of misconduct and dishonesty demonstrates that he has no intention of complying with his legal and ethical obligations unless forced to do so.

Based on the serious and repetitive nature of Beckman's ethical violations, we think he is not fit to practice law. *Cf. Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hill*, 576 N.W.2d 91, 93–94 (Iowa 1998) (revoking license of attorney with extensive disciplinary record). For the same reason, we harbor no hope that he will understand and meet his ethical responsibilities in the future. Therefore, the only way in which the public can be protected is by revocation of his license. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sullins*, 648 N.W.2d 127, 136 (Iowa 2002) (revoking license of attorney with "a pattern of serious ethical violations" because there was no reason to believe he would not continue to violate the rules in the future); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Leon*, 602 N.W.2d 336, 339 (Iowa 1999) (revoking license of attorney with a pattern of mis-

behavior, noting "[s]uch a pattern of misconduct leads us to conclude that future misconduct is likely"). This sanction is necessary, not only to protect the public, but also to protect the reputation of the bar as a whole.

## V. *Disposition.*

Mark Beckman has repeatedly and convincingly demonstrated his inability and unwillingness to abide by our canons of ethics. We agree with the Commission that he is unfit to be an attorney. Accordingly, we have no hesitation in revoking his license to practice law in this state.

Respondent shall comply with the requirements of Iowa Court Rule 35.21(1) in all respects, including sending the required notices to clients and opposing counsel within fifteen days and refunding any unearned fees within thirty days. Costs are assessed against the respondent as provided in Iowa Court Rule 35.25(1).

**LICENSE REVOKED.**

All justices concur except LARSON, J., who takes no part.