# IN THE SUPREME COURT OF IOWA

No. 13–0780

Filed December 6, 2013

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**ROBERT ALLAN WRIGHT JR.,**

Respondent.

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Grievance commission found violations of multiple ethical rules and recommended lengthy suspension. **LICENSE SUSPENDED.**

Charles L. Harrington and Nicholas Tré Critelli, Des Moines, for complainant.

Alfredo G. Parrish of Parrish, Kruidenier, Dunn, Boles, Gribble, Parrish, Gentry & Fisher, LLP, Des Moines, for respondent.

**HECHT, Justice.**

The Iowa Supreme Court Attorney Disciplinary Board (Board) charged Robert Wright Jr. with violations of the Iowa Rules of Professional Conduct based on Wright's conduct in persuading several of his clients to loan money to another client. A division of the Grievance Commission of the Supreme Court of Iowa found Wright's actions violated several ethical rules and recommended a suspension of his license to practice law. Wright has appealed from the commission's recommendation. After reviewing the record, we find Wright committed ethical violations warranting a suspension.

## I. Factual and Procedural Background.

Wright was admitted to the bar and began practicing law in 1981. He developed a general practice, handling criminal cases, family law matters, personal injury and workers' compensation claims, and employment discrimination cases. While representing Floyd Lee Madison in a criminal case in 2011, Wright was presented with documents purporting to evidence that Madison was the beneficiary of a large bequest from his long-lost cousin in Nigeria. Madison represented to Wright that upon payment of $177,660 in taxes owed on the inheritance in Nigeria, the sum of $18,800,000 would be released to Madison. He asked Wright to represent him in securing the transfer of the funds from Nigeria. In consideration for a fee equal to ten percent of the funds recovered, Wright agreed to represent Madison in the Nigerian transaction.

Wright was at that time representing Danny Wayne Rynearson in a pending felony criminal case. Wright knew Rynearson might have funds that Madison could borrow for the purpose of paying the taxes and fees on the Nigerian funds. Armed with this knowledge, Wright approached

Rynearson about his willingness to make a loan to Madison. Wright arranged a meeting in his office between Madison, Rynearson, and Rynearson's wife. As a consequence of the meeting, the Rynearsons agreed to make the loan to Madison and drew a check on June 9, 2011, in the amount of $12,000 payable to Wright. Wright prepared and signed a letter dated June 9, 2011, confirming the agreement that his client Rynearson would loan Madison the sum of $12,000 for the purpose of paying the Nigerian tax. Madison signed the document promising to pay Rynearson the sum of $50,000 "upon receipt of [the] inheritance funds." Wright deposited Rynearson's check in his trust account. Believing more funds were needed to complete the transaction, Wright informed the Rynearsons that he was in immediate need of an additional $12,500 and desperately needed their help. Mrs. Rynearson drew a check in the amount of $12,500 payable to Wright on August 1, 2011. Wright also deposited that check in his trust account.[1]

Wright was also representing Linda Putz at that time in a pending workers' compensation case. The case was nearing completion, and Wright and Putz were awaiting receipt of proceeds of a settlement. Knowing Putz would soon net approximately $25,000 from the settlement, Wright informed her Madison hoped to borrow money to pay Nigerian authorities for an "anti-terrorism certificate" and inquired

---

[1]Rynearson and his spouse requested security for this second loan. Wright consequently drew a check dated August 1, 2011, on his trust account in the amount of $12,500 payable to himself. The words "Atty fees" were typed on the memo line of the instrument. Wright endorsed the trust account check and delivered it to the Rynearsons. Wright testified that the $12,500 in attorney fees was earned while representing another client, Linda Putz, in a workers' compensation matter discussed below in this opinion. Although Wright had negotiated a settlement of Putz's claim by August 1, 2011, he had not yet received or deposited in his trust account a draft representing the settlement proceeds for that claim. The Board did not charge Wright in this proceeding with a violation of any ethical rule pertaining to the maintenance of his trust account.

whether Putz would be willing to loan the sum of $12,500 for this purpose. In a letter to Putz dated August 12, 2011, Wright memorialized a proposed loan agreement calling for Madison to repay the loan with a payment of $50,000 upon his receipt of the inheritance which was anticipated "before August 24, 2011." Putz later agreed to loan Madison an additional $12,500, and thus loaned the entire net proceeds of her settlement to Madison in consideration for his promise to pay her $100,000 upon receipt of the inheritance from Nigeria. All of the proceeds of Putz's loans to Madison were deposited in Wright's trust account.

The Board subsequently filed a complaint alleging Wright had violated several rules of professional conduct in his transactions with Danny Wayne Rynearson and Putz. Shortly before the hearing on the complaint in front of the grievance commission, Wright presented to the Board a "Disclosure Statement" revealing for the first time that he had also solicited loans for Madison from three other clients in furtherance of the Nigerian transaction.[2] The statement admitted Wright had solicited and received from Toryan White a loan for Madison in the amount of $7000. The statement also revealed Wright solicited a loan for Madison from another client, Vern Stodden, in the amount of $160,000.[3] Lastly,

---

[2]In a previous answer to an interrogatory propounded by the Board, Wright had indicated Rynearson and Putz were the only clients from whom he had solicited loans for Madison. It appears the answer was based on Wright's understanding that the interrogatory addressed solicitations from persons whom Wright was actively representing in other matters at the time of the solicitations. As we have noted, Wright was actively representing Rynearson and Putz at the time they made loans to Madison. Although Wright had represented Toryan White, Vern Stodden, and Bob Nunneman in the past, he was not actively representing them in other matters when he solicited them for loans to Madison.

[3]Of this amount, Wright testified that approximately $30,000 to $50,000 was deposited in and distributed from his trust account in payment of the demands of persons claiming to be in control of the Nigerian funds.

the statement disclosed Wright had solicited and obtained for Madison a loan in the amount of $20,000 from Bob Nunneman. Wright stipulated that he failed to advise White, Stodden, and Nunneman that they should seek independent counsel before making the loans to Madison. Denying that he derived any financial gain from these transactions, Wright urged the grievance commission to consider his voluntary disclosure as a mitigating factor in its determination of the appropriate sanction in this case.

Although Wright's disclosures of additional loan transactions on the eve of the hearing before the commission were a surprise to the Board, no objection was raised to the disclosure statement when it was offered and received in evidence by the grievance commission. In its posthearing brief, the Board urged that Wright's admitted conduct in the transactions with White, Stodden, and Nunneman be considered as an aggravating factor in the determination of the appropriate sanction for any violations committed in the transactions with Rynearson and Putz, on the ground that Wright's conduct involving White, Stodden, and Nunneman was part of a pattern arising from the same Nigerian transaction for which loans made by Rynearson and Putz were solicited.

In the course of his work on behalf of Madison in pursuit of the Nigerian inheritance, Wright communicated with persons he believed were representatives of the "Central Bank of Nigeria," the "African Union," and the President of Nigeria. Wright also communicated with Okey Okafor, a person who claimed to be the Nigerian lawyer who had witnessed the decedent's will. Wright also had communications with a person who claimed to be a lawyer in England named Johnson Walkers. Walkers claimed he had, on Madison's behalf, traveled to Nigeria and investigated the legitimacy of the inheritance.

Wright apparently transferred to others all of the loan proceeds he collected from his clients on behalf of Madison.[4]  As the story developed, Wright and Madison were told the inherited funds would be released by the Nigerian authorities for transfer to the Royal Bank of Canada.  Later, however, Wright and Madison were told the inheritance—in the form of U.S. currency—had been shipped (for reasons not detailed in the record) in two trunks to Spain where the trunks supposedly came into the possession of a "diplomat" in Madrid.  The diplomat demanded payment of €25,600 (25,600 Euros) for his "logistic charges" in return for possession of the trunks.  He instructed Wright and Madison to conceal the foreign currency in their luggage[5] and travel to Madrid where they were to pay the logistics charges and take possession of the property.  Madison traveled to Spain and later told Wright he had seen the two suitcases but failed—for reasons not explained in the record—to obtain possession of them.

Madison recovered no funds from the supposed Nigerian inheritance.  As no funds were recovered by Madison, Wright received no compensation for his professional services in the matter.  The loans made to Madison by the Rynearsons, Putz, White, Stodden, and Nunneman have not been repaid.

---

[4]The record does not reveal the details of Wright's distribution of the proceeds of the loans made by Rynearson, Putz, White, Stodden, and Nunneman.  The Board offered no evidence that Wright retained any of the proceeds for himself.

[5]This diplomat's instruction came to Madison via an email message which read verbatim, in relevant part:

> I don't know of any Bank here, beside, I will suggest you come with the administrative Logistic charges for the clearance which is €25,600 (Twenty-Five Thousand Six Hundred Euros) in your baggage, have it hide in your trouser's and have the trouser fold careful package in your luggage, so that it will be easy to proceed to custom safe storage house facilities office here to pay and pick up receipt for immediate delivery of your two trunk boxes.

Wright's license is currently suspended under an order of this court entered on August 16, 2012. The current suspension was imposed as a consequence of Wright's failure to cooperate with the efforts of the Client Security Commission to perform an audit of his lawyer trust account.

## II. The Board's Complaint.

The Board filed a complaint alleging Wright's conduct in the transactions with Rynearson and Putz violated the following rules: (1) 32:1.1 (requiring representation of a client with the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation); (2) 32:1.7 (requiring disclosure and client consent if representing a client when the representation involves a concurrent conflict of interest); (3) 32:1.8(a) (requiring disclosure and client consent when entering into a business transaction with a client or knowingly acquiring an ownership interest or other pecuniary interest adverse to a client); (4) 32:1.8(b) (requiring disclosure and client consent when using information relating to representation of a client to the disadvantage of the client); (5) 32:8.4(c) (prohibiting engagement in conduct involving dishonesty, fraud, deceit, or misrepresentation); and (6) 32:1.2(d) (prohibiting assisting a client in conduct the lawyer knows to be illegal or fraudulent).

## III. The Commission's Report.

The Board's posthearing brief withdrew the allegation that Wright violated rule 32:1.2(d) by assisting a client in conduct Wright knew to be illegal or fraudulent. The Board made this withdrawal based on its view that "Wright clearly believed in the legitimacy of Madison's inheritance . . . ." Noting "Wright appears to have honestly believed—and continues to believe—that one day a trunk full of . . . one hundred dollar bills is

going to appear upon his office doorstep," the Board asserted before the commission that Wright's conduct might aptly be described as delusional, but not fraudulent.

The commission's report found by a convincing preponderance of the evidence that Wright's conduct in his transactions with Madison, Rynearson, and Putz violated each of the other rules as alleged in the Board's complaint. The commission's findings of violations were also based on Wright's conduct in soliciting loans from White, Stodden, and Nunneman based on the substance of Wright's disclosure statement.[6] The report recommends a lengthy suspension be imposed.[7]

### IV. Scope of Review.

We review the commission's report de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Howe*, 706 N.W.2d 360, 366 (Iowa 2005). "Under this standard of review, we give weight to the factual findings of the Commission, especially with respect to witness credibility, but we find the facts anew." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Beckman*, 674 N.W.2d 129, 131 (Iowa 2004). "Although we respectfully consider the discipline recommended by the Commission, the final decision on the appropriate sanction is for this court." *Howe*, 706 N.W.2d at 366. The Board, as the complainant, must prove its

---

[6]Although the complaint did not charge Wright with rule violations for carrying out these transactions, the parties clearly litigated rule violations based on the transactions before the commission. Adopting the Board's contention that the transactions involving White, Stodden, and Nunneman were part of a single course of conduct and should be considered in this proceeding, the commission made findings and recommended a sanction based on them. As the transactions involving White, Stodden, and Nunneman were stipulated to by Wright and presented to the commission by the parties, we will also consider them.

[7]The commission did not unanimously agree on the length of the recommended suspension. Four members recommended Wright's license to practice be suspended for two years; one member recommended a suspension of one year.

allegations of misconduct by a convincing preponderance of the evidence. *Id.*

**V. Violations**.

**A. Rule 32:1.1.** Rule 32:1.1 requires that attorneys competently represent their clients. Iowa R. Prof'l Conduct 32:1.1. The requirement of competence dictates that practitioners apply "the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." *Id.* It is the Board's burden to prove Wright either lacked the legal knowledge or skill for the tasks he was hired to perform, or he failed to make a competent analysis of the factual and legal elements of a client's legal problem. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Hauser*, 782 N.W.2d 147, 153 (Iowa 2010).

Wright is not the first Iowa lawyer who has become entangled in a deception with ostensible Nigerian connections. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Jones*, 606 N.W.2d 5, 9 (Iowa 2000) (noting the incidence of fraudulent transactions with purported connections to the country of Nigeria). Lawyers in other jurisdictions have also been entangled and deceived in such schemes in recent years. *See, e.g., In re Maxwell*, 334 B.R. 736, 738–41 (Bankr. M.D. Fla. 2005); *Parker v. Williams*, 977 So. 2d 476, 477–78 (Ala. 2007); *Lappostato v. Terk*, 71 A.3d 552, 559–60 (Conn. App. Ct. 2013); *In re Reinstatement of Jones*, 203 P.3d 909, 912–13 (Okla. 2009); *see also Lucas v. BankAtlantic*, 944 So. 2d 1031, 1032 (Fla. Dist. Ct. App. 2006) (describing a deception originating in Africa). The Board's evidence in this case established that a cursory internet search using the query "anti-terrorism certificate" in early 2011 would have revealed evidence that Madison's dream of a Nigerian inheritance was probably based on a scam.

Although Wright apparently communicated with persons holding themselves out as attorneys, diplomats, representatives of the Nigerian government, the "Central Bank of Nigeria," the Canadian Department of Justice, the Royal Bank of Canada, and "a special adviser (sic) to the President [of Nigeria] on financial matters," he failed to verify that any of them were who they claimed to be. And although Wright received documents purporting to be a last will and testament, a death certificate, and an "Anti Terrorist Clearance Certificate," they were facially of doubtful validity. Without confirmation of the authenticity of the documents, the authority of the persons he was dealing with, or the existence of the allegedly inherited funds, Wright apparently disbursed more than $200,000 in pursuit of the scam. We find Wright violated rule 32:1.1 when he failed to make a competent analysis of the bona fides of Madison's Nigerian legal matter.

**B. Rule 32:1.8(a).** The Iowa Rules of Professional Conduct regulate lawyers' business transactions with "current clients." Iowa R. Prof'l Conduct 32:1.8.

This rule provides in relevant part:

> a. A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client unless:

> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

> (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

> (3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction

> and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

*Id.* r. 32:1.8(a). Commentators have observed that attorneys combining "the distinct roles of loyal counselor and business participant" in transactions with their clients "[skate] on thin ice and will receive little sympathy in Iowa if the ice should break." 16 Gregory C. Sisk & Mark S. Cady, *Iowa Practice Series: Lawyer and Judicial Ethics* § 5.8(c), at 373 (2013).

We conclude Wright's undisclosed contingent fee interest in Madison's inheritance claim constituted a pecuniary interest that was adverse to the interests of Rynearson and Putz. Madison and Wright urgently desired to obtain the funds to pay the taxes and fees demanded by the persons who claimed control of the Nigerian inheritance. The willingness of Madison and Wright to risk their own time and resources on a transparently dubious enterprise may not have been identical to the willingness Rynearson and Putz had regarding the enterprise. Wright failed to advise Rynearson and Putz they should seek advice from an independent lawyer on the risky loan transactions. As we have already noted, Wright failed to obtain the clients' written informed consent to the proposition that he held a contingent fee interest in Madison's inheritance claim and was therefore not representing Rynearson and Putz in the transactions involving the loans he solicited from them. Wright also failed to counsel the affected clients about the importance of independent legal advice in the loan transactions. We have recently emphasized that lawyers engaged in business transactions involving conflicting interests with clients "have a duty to explain carefully, clearly and cogently why independent legal advice is required." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wintroub,* 745 N.W.2d 469, 474 (Iowa 2008)

(citation and internal quotation marks omitted). Accordingly, we conclude Wright's failure to disclose his adverse pecuniary interest and his failure to explain the importance of independent counsel to Rynearson and Putz constituted a violation of rule 32:1.8(a).

We analyze separately Wright's conduct in soliciting and completing the loan transactions with White, Stodden, and Nunneman. As we have noted, Wright was not engaged in the current representation of these three persons when he solicited loans from them on behalf of Madison. The record does not reveal the details of the matters for which Wright represented White, Stodden, and Nunneman, and it does not disclose the time period in which those former attorney–client relationships existed. Thus, on this record, we find the Board failed to prove these three persons were Wright's "current clients" when he solicited loans from them for Madison. Accordingly, we find no violation of rule 32:1.8(a) resulting from Wright's conduct with White, Stodden, and Nunneman.

**C. Rules 32:1.7, 32:1.8(b).** The Board also charged Wright with violation of rules 32:1.7 (prohibiting representation of a client if the representation involves a concurrent conflict of interest) and 32:1.8(b) (prohibiting use of information relating to the representation of a client to the disadvantage of the client). Because adjudication of these alleged violations will not affect the sanction we impose under these circumstances, we will not decide them here.

**D. Rule 32:8.4(c).** The Board's complaint charged Wright with violation of rule 32:8.4(c) as a consequence of the transactions with Rynearson and Putz. This rule includes within the definition of "professional misconduct" behavior "involving dishonesty, fraud, deceit, or misrepresentation." Iowa R. Prof'l Conduct 32:8.4(c). The commission

found Wright's failure to disclose to Rynearson and Putz: (1) the substantial risks inherent in the loans to Madison in furtherance of the risky Nigerian transaction, (2) that he did not intend to protect the interests of Rynearson and Putz in the loan transactions, and (3) his contingent fee interest in Madison's inheritance claim constituted deceit and resulted in a violation of rule 32:8.4(c). We agree. In a case with striking factual similarities, we found an Iowa attorney violated a prior version of this rule when he solicited a loan of $5000 from a former client he had represented about twenty years earlier in a dissolution action. *Jones,* 606 N.W.2d at 6, 9. In that case, we found the rule was violated in part because Jones had failed to disclose to the former client from whom he had solicited the loan the fact that the transaction was very risky under the circumstances, and in part because he had failed to reveal he had taken a contingent interest in the Nigerian transaction.

**VI. Sanction.**

When deciding on an appropriate sanction for an attorney's misconduct, we consider

> the nature of the violations, protection of the public, deterrence of similar misconduct by others, the lawyer's fitness to practice, and [the court's] duty to uphold the integrity of the profession in the eyes of the public. We also consider aggravating and mitigating circumstances present in the disciplinary action.

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Walker,* 712 N.W.2d 683, 685 (Iowa 2006) (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Honken,* 688 N.W.2d 812, 820 (Iowa 2004)) (internal quotation marks omitted). "There is no standard sanction for a particular type of misconduct, and though prior cases can be instructive, we ultimately determine an appropriate sanction based on the particular

circumstances of each case." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley*, 774 N.W.2d 301, 308 (Iowa 2009).

The range of sanctions imposed upon attorneys engaging in representation of clients in violation of conflict of interest rules and engaging in misrepresentation or deceit resulting in a client's financial loss has spanned a continuum from a suspension of two months to a revocation of a license to practice law depending on the severity of the violations. *See Jones*, 606 N.W.2d at 9 (imposing two-month suspension); *Comm. on Prof'l Ethics & Conduct v. Hall*, 463 N.W.2d 30, 35–36 (Iowa 1990) (citing cases imposing sanctions up to and including revocation depending on nature and extent of violations).

In determining the appropriate sanction in this case, we consider aggravating factors supported by the evidence. We note the violations committed by Wright involved a course of conduct involving multiple clients who together lost substantially more money than was lost by the unwitting lender in *Jones*. *See Jones*, 606 N.W.2d at 9. Generally, "more severe discipline is warranted when the ethical violations cause harm to clients." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Jay*, 606 N.W.2d 1, 4 (Iowa 2000). Our calibration of the sanction also requires us to consider the fact that Wright is an experienced lawyer with more than thirty years of practice behind him. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wagner*, 599 N.W.2d 721, 730 (Iowa 1999). We consider Wright's prior record of three private admonitions and two public reprimands as an additional aggravating factor affecting our decision. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. McKittrick*, 683 N.W.2d 554, 563 (Iowa 2004).

We also consider at this juncture mitigating factors supported by the evidence in this case. Wright has a long history of pro bono service to indigent clients and dedication to public service.

We recognize that "[t]he canons of ethics are not primarily intended to mete out abstract justice to wayward attorneys, but rather are chiefly intended to provide protection to the public." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Scieszinski*, 599 N.W.2d 472, 474 (Iowa 1999). Having considered all of the factors bearing upon the selection of an appropriate sanction in this case, we conclude a suspension of twelve months should be imposed here. This suspension should begin at such time as the temporary suspension of Wright's license imposed by this court on August 16, 2012, is lifted.[8]

**VII. Disposition.**

We suspend Wright's license to practice law in this state with no possibility of reinstatement for a period of no less than twelve months. This suspension applies to all facets of the practice of law, including but not limited to advertising his services. *See* Iowa Ct. R. 35.13(3). The period of suspension shall commence at such time as this court enters an order lifting the temporary suspension now in place. Prior to any reinstatement of his license to practice law following the period of suspension ordered in this opinion, Wright shall establish that he has not practiced law during the period of suspension, that he has conformed to the rules and procedures governing reinstatement set forth in rule 35.13, and that he has complied with the notification requirements in

---

[8]The order of August 16, 2012, provides Wright's license shall remain suspended until the Client Security Commission certifies that Wright has fully complied with its audit request and this court enters an order reinstating his license to practice law.

rule 35.22.  We tax the costs of this proceeding to Wright pursuant to rule 35.27(1).  Iowa Ct. R. 35.27(1).

**LICENSE SUSPENDED**.