# IN THE SUPREME COURT OF IOWA

No. 21–0214

Submitted September 16, 2021—Filed October 15, 2021

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**BRUCE A. WILLEY,**

Respondent.

On review of the report of the Iowa Supreme Court Grievance Commission.

In an attorney disciplinary action, the grievance commission recommends a thirty-day suspension for attorney's violation of conflict of interest rules. **LICENSE SUSPENDED.**

Oxley, J., delivered the opinion of the court, in which all justices joined.

Tara van Brederode and Allison A. Schmidt, Des Moines, for complainant.

David L. Brown and Alexander E. Wonio of Hansen, McClintock & Riley, Des Moines, for respondent.

**OXLEY, Justice.**

Attorneys who engage in business dealings with their clients create an inherent conflict of interest under our rules of professional conduct. Such conflicts are not prohibited—as long as the attorney first meets strict disclosure requirements and provides adequate information so their clients can make an informed consent to the conflict. Attorney Bruce A. Willey appears before us for the second time for engaging in similar conduct for which we previously disciplined him but with different clients and in deals that predate the conduct giving rise to Willey's previous discipline. The Iowa Supreme Court Grievance Commission (commission) recommends we suspend Willey's license for thirty days on the theory that had we known about this conduct we would have suspended his license for a longer period the first time. Upon our de novo review of the record, we suspend Willey's license for thirty days.

## I. Background Facts and Proceedings.

Willey was admitted to practice law in Iowa in 1993. He is an experienced attorney and a certified public accountant (CPA), who specializes in tax and business law.

The conduct bringing Willey to the Board's attention involves business dealings with Willey's client, David Wild, and Willey's recruitment of other clients into those ventures. Wild is a self-proclaimed project developer in industries involving timber, renewable energy, and land development in the United States as well as internationally. Willey and Wild developed an attorney–client relationship and were business partners between approximately 2006 and 2014.

Willey formed at least twenty entities for Wild over that time. Willey never received payment from Wild for his legal work, estimated to total between $20,000 and $100,000, believing he would see a return through one of Wild's ventures. Despite Wild's claimed experience, he never completed a successful venture with Willey. Their relationship ended when the events involved in this case went south and a judgment was entered against Wild.

**A. Prior Disciplinary Proceedings.** We disciplined Willey in 2017 based on a transaction between two of Willey's clients, Synergy Projects, Inc. (Synergy), a business owned by David Wild and organized by Willey, and Henry Wieniewitz. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Willey* (*Willey I*), 889 N.W.2d 647, 649–52 (Iowa 2017). In June 2010, Willey presented an investment opportunity to Wieniewitz in the form of an unsecured loan from Wieniewitz to Synergy that was memorialized through a promissory note drafted by Willey. *Id.* at 650. Despite Willey's reassurances and description of the opportunity as "safe and common," Wieniewitz never received repayment of his $100,000 loan or the promised $300,000 of additional payments. *Id.* at 650–52. We determined Willey had violated rule 32:1.7(a)(2) by representing both the lender and borrower in a loan transaction, putting them "at odds from the beginning." *Id.* at 656. He also violated rule 32:1.7(b)(4) by failing to obtain informed consent from Wieniewitz where Willey never told Wieniewitz that Wild and Synergy were his clients or the extent of his involvement in Wild's business. *Id.* We suspended Willey's license for sixty days for violating our conflict of interest and informed consent rules. *Id.* at 656, 658.

**B. Current Disciplinary Proceedings.** The complaint in this case arose from Willey's representation of another David Wild company, Catalyst Resource Group (Catalyst), and another Willey client, Midwest S.N. Investors, LLC (Midwest), involving events between 2007 and 2009.

Willey organized Catalyst in August 2007 and served as its attorney. R.O.F. Management, Inc., a company in which Willey and Wild co-owned shares of stock, managed Catalyst. Orion's Pride, owned by Willey, and Braveheart, owned by Wild, were equal members of Catalyst.

In a scheme that neither Willey nor Wild were able to adequately describe to the commission, Catalyst entered a joint services agreement (JSA) in early 2008 with Ramis Limited (Ramis), a London company. According to Willey, Ramis had access to a lucrative investment trading platform involving leased bank notes that was used in Asia and Europe but was significantly restricted in the United States. According to the JSA, Ramis had access to "opportunities for securitized and/or structured project funding with financial institutions" that could achieve "moderate to high level returns"—it just needed cash to bring these opportunities to fruition. For its part, Catalyst claimed to hold certain assets, namely cash, and agreed to provide the cash as investment capital to fund Ramis's expertise in private placements. Catalyst represented it had "sufficient knowledge and experience in financial matters to be able to evaluate the relative risks and merits of this JSA" and that it was an "accredited investor" under the Securities Act of 1933, although Wild testified that was untrue. The agreement contemplated Catalyst transferring between $500,000 and $700,000 to Ramis

and receiving access to $50 to $100 million worth of lines of credit to fund Catalyst's unidentified projects.

To fund Catalyst's investment with Ramis, Willey agreed to approach some of his contacts. Willey secured a $500,000 loan from Laurus Technologies, Inc., with whom Willey had no attorney–client relationship. Willey also arranged a $200,000 loan from Midwest through its owner, Nate Kaeding. Willey served as Midwest's attorney, as well as Kaeding's personal attorney, at the time.

Willey drafted a promissory note and a personal guaranty to be executed by Wild for both the Laurus and the Midwest loans. Wild signed the $200,000 note on behalf of Catalyst, promising to repay Midwest $250,000 within ninety days, and signed the personal guaranty in his individual capacity. Wild was judgment proof at the time he signed the guaranty and had other financial difficulties that Willey knew about, but Willey did not ask him to provide Midwest or Kaeding with a financial statement to support the personal guaranty. The Laurus and Midwest loans were also secured by "so much of member units owned by [Wild] in WL Partners, LLC holder of a 2.62% interest in The IDEA Group, LLC, a bio-fuels company." While Willey testified Wild's 2.62% equity interest in The IDEA Group was worth more than $700,000, he provided no documentary support for that valuation and could not answer basic questions about its assets or income to support his valuation.

The funds from the Laurus and Midwest loans were deposited in Willey's trust account in early May 2008. Willey wired $500,000 to Ramis; Willey and Wild split $100,000; and $100,000 went into Catalyst's checking account.

Although Willey denied any memory of doing so, records reveal that on May 22, Willey borrowed $67,552.47 from the Catalyst checking account and two days later a $65,000 judgment by confession in favor of American Express against Willey was paid and released as fully satisfied. Willey never informed Midwest that he would personally benefit from the funds loaned to Catalyst.

Under the terms of the JSA, Ramis offered no security for return of the $500,000 investment, and Catalyst never saw another penny despite Willey's minimal collection efforts. In turn, Catalyst never repaid the Laurus or Midwest loans used to fund the Ramis deal. Over the next three-and-a-half years, Willey provided numerous excuses to Kaeding about why the promised ninety-day repayment of the Midwest loan was delayed and identified varying sources to fund purportedly imminent, yet always elusive, repayment of the Midwest loan. Willey alleges he personally paid Midwest $15,000 after Kaeding threatened litigation. Despite involving counsel, Midwest has not filed actions against Catalyst, Wild, or Willey or brought any ethics complaints against Willey.

Wild and Willey's relationship soured after Wild was sued on the Laurus note. Avnet Technologies, as successor to Laurus's interest in the note, received a judgment against Wild on the personal guaranty used to secure Laurus's $500,000 loan to Catalyst. Prior to filing this ethics complaint, Wild brought a civil action against Willey for malpractice, breach of fiduciary duty, fraudulent misrepresentation, and equitable indemnity premised on the events that led to the Avnet judgment against him. The claims were dismissed for failure to timely designate an expert and statute of limitations problems. Wild appealed the

dismissals, and the Iowa Court of Appeals affirmed. *Wild v. Willey*, No. 18–0172, 2019 WL 2314579, at *8 (Iowa Ct. App. Mar. 6, 2019).

After his unsuccessful civil action against Willey, Wild filed an ethics complaint with the Board in November 2018, and the Board filed the complaint at issue here on March 28, 2019. On February 16, 2021, the commission issued its report and recommendation finding the Board failed to establish Willey violated the Iowa Rules of Professional Conduct in his representation of Wild, concluding Wild was a sophisticated businessman and Willey adequately disclosed information required to make his consent informed as revealed in the consent Wild signed. It did find, however, Willey violated rules 32:1.7, 32:1.8(a), and 32:8.4(c) in his representation of Midwest and recommends a thirty-day suspension. The commission reasoned that we would have suspended Willey's license for a longer period in 2017 had we known about these prior events. Willey argues there is insufficient evidence to support a finding he violated any of the Iowa Rules of Professional Conduct in his representation of Midwest. He further argues that if we find a violation he is subject only to a private admonition or public reprimand under our prior cases.

## II. Standard of Review.

We review attorney disciplinary proceedings de novo. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Watkins*, 944 N.W.2d 881, 887 (Iowa 2020). The Board must prove the alleged attorney misconduct by a convincing preponderance of the evidence, which is a more demanding standard than proof by a preponderance of the evidence, but "less [demanding] than proof beyond a reasonable doubt."

*Id.* (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Stansberry*, 922 N.W.2d 591, 593 (Iowa 2019)); *see also* Iowa *Sup. Ct. Att'y Disciplinary Bd. v. Nine*, 920 N.W.2d 825, 827–28 (Iowa 2018). When an attorney's representation gives rise to a conflict of interest with another client or with the attorney's own interests, the burden shifts to the attorney "to prove that all . . . transactions were fair and equitable." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Qualley*, 828 N.W.2d 282, 289 (Iowa 2013) (quoting *Iowa Sup. Ct. Bd. of Pro. Ethics & Conduct v. Wagner*, 599 N.W.2d 721, 723 (Iowa 1999)). "We give respectful consideration to commission findings, especially when considering credibility of witnesses, but are not bound by them." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Said*, 953 N.W.2d 126, 142 (Iowa 2021) (citing *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Van Ginkel*, 809 N.W.2d 96, 101 (Iowa 2012)).

### III. Disciplinary Rule Violations.

This appeal turns on application of the informed consent rules involving conflicts of interest. Willey does not dispute there was a concurrent conflict of interest in his representation of Wild-Catalyst and Midwest. Nor does he dispute that through his interest in Catalyst he entered into a business transaction with Midwest. Rather, he argues the Board presented insufficient evidence to support its allegations that he failed to adequately disclose those conflicts because no one from Midwest testified. Indeed, Midwest has never complained about Willey to the Board. The only evidence presented to the commission about Willey's disclosures to Midwest is the consent and waiver form Willey drafted and Midwest signed. Willey further argues the attorney–client privilege prevented him

from defending himself because Midwest did not waive the privilege and he could not testify about the verbal conversations that preceded Midwest's execution of the consent and waiver.

**A. Effect of Attorney–Client Privilege in Disciplinary Proceedings.** While this proceeding came before the Board based on a complaint by Wild, the Board brought disciplinary charges against Willey based on his representation of both Wild and Midwest in the transaction about which Wild complained. The commission concluded the charges related to Wild were not supported, but the charges related to Midwest were.

We first address, and reject, Willey's suggestion he could not defend himself related to Midwest because Midwest was not a complaining party and therefore had not waived its attorney–client privilege. Willey relies on Iowa State Bar Association, Ethics and Practice Guidelines Committee, Ethics Opinion 15–03 (July 15, 2015) [hereinafter ISBA Opinion], to support his argument. The ethics opinion was issued in response to a question about application of American Bar Association, Committee on Ethics and Professional Responsibility, Formal Ethics Opinion 10–456 (July 1, 2010), in Iowa. Although it dealt specifically with the disclosure of attorney–client privileged information in the context of a postconviction-relief action alleging ineffective assistance of counsel, ISBA Opinion 15–03 concluded broadly that when a third party initiates a proceeding, such as a disciplinary proceeding, the attorney may not disclose client confidences in defending against those allegations absent express consent from the client or court adjudication after notice to the client.

Before July 2005, the Iowa Supreme Court Board of Professional Ethics and Conduct was authorized to issue formal advisory opinions to members of the bar. *See* 16 Gregory C. Sisk & Mark S. Cady, *Iowa Practice Series Lawyer & Judicial Ethics* § 2.12 (2015). The advisory opinions were effective unless modified by a decision by this court, an amendment to the Iowa Court Rules, or a superseding formal advisory opinion. *Id.* After July 2005, we removed the responsibility to issue formal advisory opinions from what was renamed the Iowa Supreme Court Attorney Disciplinary Board. *Id.* At that time we accepted the invitation of the Iowa State Bar Association to assume this responsibility. *Id.* While we continue to welcome the assistance of the Iowa State Bar Association to aid Iowa attorneys in their efforts to practice law in accordance with our disciplinary rules, "advisory opinions . . . issued by the Iowa State Bar Association do not have the force of law and are not binding on the court, as Iowa law places sole responsibility for the regulation of the practice of law in the supreme court." *Id.* (quoting Iowa Sup. Ct. Supervisory Order (April 21, 2005)).

The plain language of our disciplinary rules reveals that Willey could disclose attorney–client confidences in defending himself regardless of Midwest's consent to the disclosure. Iowa Rule of Professional Conduct 32:1.6(b)(5) provides:

> A lawyer may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary: . . . to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations

in any proceeding concerning the lawyer's representation of the client[.]

Comment ten to rule 32:1.6 further emphasizes the rule's application here. "Where a legal claim or disciplinary charge alleges . . . misconduct of the lawyer involving representation of the client, the lawyer may respond to the extent the lawyer reasonably believes necessary to establish a defense." *Id.* r. 32:1.6 cmt. [10]; *see also Iowa Sup. Ct. Att'y Disciplinary Bd. v. Marzen*, 779 N.W.2d 757, 766 (Iowa 2010) ("Comment ten to the rule makes clear that the ability to defend arises in criminal and civil proceedings, including disciplinary actions."). That said, an attorney can reveal confidential client information only in the appropriate forum and only to the extent necessary to protect the attorney in that proceeding. *See Marzen*, 779 N.W.2d at 766–67 (holding attorney's disclosure of client's confidences to the media was not protected by rule 32:1.6, explaining the disclosure may have been "necessary to defend [his] bid for county attorney, [but] it was not necessary to defend him against the allegations of this disciplinary proceeding").

We have not addressed whether a client must initiate the disciplinary action for rule 32:1.6(b)(5) to apply to that client's communications. The plain language of the rule is not so limiting. The rule includes a disjunctive list of three scenarios in which an attorney may reveal confidential information, the first of which expressly includes a "controversy between the lawyer and the client." Iowa R. Prof'l Conduct 32:1.6(b)(5). The other two scenarios apply more broadly to criminal or civil actions "against the lawyer based upon conduct in which the client was involved" or when an attorney needs "to respond to allegations in any

proceeding concerning the lawyer's representation of the client." *Id.* Neither of the latter circumstances contemplates the client as a necessary participant in the proceedings before an attorney may defend his actions by revealing—to the extent necessary—client confidences.

To limit the self-defense exception to only those disciplinary proceedings in which the client has complained would significantly limit our ability to regulate the practice of law in Iowa, a proposition we reject. Our conclusion is bolstered by other courts' interpretation of similar attorney–client privilege disclosure exceptions. In *In re Disciplinary Action Against Dyer*, two attorneys faced disciplinary charges for removing funds from their trust account before the fees were earned. 817 N.W.2d 351, 354 (N.D. 2012) (per curiam). They refused to turn over client billing records and trust account statements, asserting the information was confidential and disclosure would violate the North Dakota equivalent of our rule 32:1.6. *Id.* Despite an order from the hearing panel to turn over the records and the North Dakota Supreme Court's denial of their request for a supervisory writ, the attorneys persisted in withholding the documents. *Id.* The disciplinary council added a charge that the attorneys violated another ethics rule by knowingly failing to respond to a lawful demand from the disciplinary authorities. *Id.* The hearing panel concluded the council failed to prove the attorneys improperly withdrew trust account funds, in part for lack of evidence given the refusal to turn over records, but did prove the failing to respond violation and recommended a nine-month suspension. *Id.*

In its de novo review, the North Dakota Supreme Court rejected the attorneys' insistence that the requested records were confidential and protected from disclosure under their rule 32:1.6 equivalent where the clients whose records were sought had not filed a disciplinary complaint. *Id.* at 358.

> Under the plain language of the rule . . . the exception is not limited to controversies between lawyer and his or her client.
>
> . . . . Other authorities have interpreted this exception to Rule 1.6 in a similar manner and have held a lawyer is permitted to disclose information related to the representation of a client in any proceeding concerning the lawyer's representation of the client, including proceedings where the controversy is not between the attorney and his or her client. *See* . . . Annotated Model Rules of Prof'l Conduct, R. 1.6 annot. at p. 110 (7th ed. 2011) (rule permits disclosure to defend claims brought by third parties as well as clients, which may arise in civil, criminal, disciplinary, or other proceedings); Geoffrey C. Hazard, Jr. et al., The Law of Lawyering § 9.25, 9–109 (3d ed. 2012) (the last clause of this provision concerns disciplinary or other proceedings brought against a lawyer on account of his representation of a client and applies when a third party challenges the lawyer's representation) . . . .

*Id.*

Other courts have similarly applied the rule. *See, e.g., People v. Robnett,* 859 P.2d 872, 879 (Colo. 1993) (en banc) (per curiam) (holding that the self-defense exception to Colorado's version of rule 32:1.6 is not restricted to proceedings initiated by allegations from the client where client's granddaughter, rather than client, brought charge of misconduct). While an attorney has an obligation to limit disclosure of client confidences to that necessary to defend oneself, an attorney may not invoke the attorney–client privilege as a shield to avoid answering disciplinary charges. *See* 16 Gregory C. Sisk & Mark S. Cady, *Iowa Practice Series Lawyer & Judicial Ethics* § 5:6(j) (2015) ("[T]he lawyer who is

notified that he is the subject to a disciplinary complaint may not invoke client confidentiality as a basis for refusing to respond, although he should resist intrusion into confidentiality beyond that truly necessary to refute the disciplinary charge and should seek to limit or seal the use of the information by disciplinary authorities. The limited protection to confidentiality incorporated into subparagraph (b)(5) is that the lawyer may not disclose confidential information beyond what is reasonably necessary in defense.").

Moreover, even absent disclosure of Willey's discussions with Midwest, the commission's findings were not fundamentally unfair as he suggests. As discussed below, the only violations we find concern the requirements for written disclosures, which were lacking in the consent and waiver Willey provided to Midwest. Therefore, Willey's perceived inability to testify about his verbal discussions with Midwest did not inhibit his ability to defend himself in these proceedings.

**B. Iowa Rules of Professional Conduct 32:1.7(b)(4) and 32:1.8(a).** The commission concluded Willey violated both rules 32:1.7 and 32:1.8 in his representation of Midwest. Rule 32:1.7 prohibits an attorney from representing clients with conflicting interests. Rule 32:1.8 prohibits an attorney from entering into a business transaction with a current client. Both rules are implicated because Willey not only entered into a transaction with Midwest through his interest in Catalyst, he also prepared the promissory note between Midwest and Catalyst as well as the personal guaranty signed by Wild, thereby representing conflicting clients.

Rule 32:1.8(a) prohibits an attorney from entering into a business transaction with a client unless:

> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;
>
> (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and
>
> (3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

Iowa R. Prof'l Conduct 32:1.8(a)(1)–(3).

Rule 32:1.7 in turn precludes an attorney from representing "a client if the representation involves a concurrent conflict of interest." *Id.* r. 32:1.7(a). Notwithstanding this prohibition, an attorney may represent concurrent clients if each gives "informed consent, confirmed in writing." *Id.* r. 32:1.7(b)(4); *see also Iowa Sup. Ct. Att'y Disciplinary Bd. v. Stoller*, 879 N.W.2d 199, 210 (Iowa 2016). The requirements of rule 32:1.7 must also be satisfied when the attorney represents a client in the same transaction in which the attorney has an interest.

> The risk to a client is greatest when the client expects the lawyer to represent the client in the transaction itself or when the lawyer's financial interest otherwise poses a significant risk that the lawyer's representation of the client will be materially limited by the lawyer's financial interest in the transaction. Here the lawyer's role requires that the lawyer must comply, not only with the requirements of paragraph [32:1.8](a), but also with the requirements of rule 32:1.7. Under that rule, the lawyer must disclose the risks associated with the lawyer's dual role as both legal adviser and participant in the transaction, such as the risk that the lawyer will structure the transaction or give legal advice in a way that favors the lawyer's interests at the expense of the client.

Iowa R. Prof'l Conduct 32:1.8 cmt. [3].

Midwest executed a consent and waiver drafted by Willey as part of the Midwest loan to Catalyst. The three-page consent and waiver acknowledged Kaeding had "been fully informed" of potential conflicts in Willey's representation of Kaeding and Midwest, advised Midwest to seek independent counsel, and included the full text of rule 32:1.8(a). The consent and waiver identified the specific conflict as follows:

> [C]onflicts may arise due to a secured, short term loan that may be made by Midwest to [Catalyst] a company established by [Willey] for another client of the firm and in which he anticipates owning an undetermined percentage of at some time in the future. Willey represents Midwest and Kaeding in addition to his representation of [Wild] and [Catalyst].

The consent and waiver also explained that a conflict may arise any time the economic interests of the company are at issue, which could impair the attorney's professional judgment since the attorney may have an interest in preserving or maximizing the value of his investment to the detriment of the company. We must determine whether the consent and waiver satisfied the disclosure and informed consent requirements of rule 32:1.8(a)(1)–(3) and rule 32:1.7(b)(4).

"While rule 32:1.8(a) does not prohibit business dealings between a lawyer and his or her client, it imposes stringent requirements on such a transaction." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Powell*, 901 N.W.2d 513, 515 (Iowa 2017) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Marks*, 814 N.W.2d 532, 538 (Iowa 2012)); *see also Iowa Sup. Ct. Att'y Disciplinary Bd. v. Hamer*, 915 N.W.2d 302, 322 (Iowa 2018) (recognizing rule 32:1.8 as imposing "harsh and demanding"

responsibilities on attorneys and noting the "onerous burden . . . should make such business transactions the exception rather than the rule").

> A client simply cannot waive the conflict as a matter of informal routine. The disclosure must include a detailed, situation-specific discussion of the ways that are reasonably foreseeable in which the attorney's conflict could potentially impact that particular client with that particular conflict, along with all of the other required disclosures including how confidential information will be handled.

*Hamer*, 915 N.W.2d at 322–23.

Disclosing details of a conflict of interest in writing is especially important when the attorney has an interest in the transaction. *See Peaslee v. Pedco, Inc.*, 388 A.2d 103, 107 (Me. 1978) (holding that clients were entitled to know the attorney had a personal stake in the transaction in deciding whether to consent to retaining him or his associate as their attorney); *In re Disciplinary Proceeding Against Hall*, 329 P.3d 870, 875 (Wash. 2014) (en banc) (holding waiver provisions in an attorney's engagement letter and a will and trust to be insufficient when the provisions did not explain the attorney's role in the transactions). In *Iowa Supreme Court Board of Professional Ethics & Conduct v. Wagner*, we explained that when entering into a business transaction with a client, Iowa attorneys

> have a duty to explain carefully, clearly and cogently why independent legal advice is required. When a lawyer has a personal economic stake in a business deal, [the lawyer] must see to it that [the] client understands that [the lawyer's] objectivity and [the lawyer's] ability to give [the] client [the lawyer's] undivided loyalty may be affected.

599 N.W.2d at 727–28 (alterations in original) (quoting *In re Wolk*, 413 A.2d 317, 321 (N.J. 1980) (per curiam)).

Here, the Midwest waiver violated rule 32:1.8(a) in a number of ways. First, it misrepresented Willey's interest in Catalyst as an "anticipate[d]" and "future" interest rather than identifying his actual 50% ownership interest through Orion's Pride in violation of subparagraph (3) requiring written disclosure of the attorney's "role in the transaction." Iowa R. Prof'l Conduct 32:1.8(a)(3); *see also Iowa Sup. Ct. Att'y Disciplinary Bd. v. Wright,* 840 N.W.2d 295, 301–02 (Iowa 2013) (holding attorney "failed to obtain the clients' written informed consent to the proposition that he held a contingent fee interest in Madison's inheritance claim"). Willey also failed to disclose that Wild had significant financial liabilities, was judgment proof, and had failed to enter any successful ventures in the time they worked together, information that made his personal guaranty likely worthless. The purpose for the loan—to fund Catalyst's investment in a risky and unsecured foreign trading platform—was important information about the nature of the proposed loan. Each of these pieces of information were omitted in violation of rule 32:1.8(a)(1), requiring the transaction and terms on which the attorney obtained his interest in the company to be "fair and reasonable to the client" and "fully disclosed and transmitted in writing." Iowa R. Prof'l Conduct 32:1.8(a)(1); *see also Iowa Sup. Ct. Att'y Disciplinary Bd. v. Lynch,* 901 N.W.2d 501, 507 (Iowa 2017) (holding loan terms were not fair and reasonable where the interest rates were low for the unsecured risk involved).

Finally, the consent and waiver failed to provide the essential terms of the transaction required to ensure informed consent as required by rule 32:1.8(a)(3). Here, we reject Willey's suggestion that his written disclosure adequately

summarized his more detailed oral conversations—conversations he refused to disclose under the attorney–client privilege. " 'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Iowa R. Prof'l Conduct 32:1.0(e). Comment six further explains:

> Ordinarily, this will require communication that includes a disclosure of the facts and circumstances giving rise to the situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct, and a discussion of the client's or other person's options and alternatives.

*Id.* r. 32:1.0(e) cmt. [6]. We recognize informed consent contemplates verbal discussions with the client, and not all details can be reduced to writing. *See, e.g.*, *id.* r. 32:1.7 cmt. [20] ("The requirement of a writing does not supplant the need in most cases for the lawyer to talk with the client, to explain the risks and advantages, if any, of representation burdened with a conflict of interest, as well as reasonably available alternatives, and to afford the client a reasonable opportunity to consider the risks and alternatives and to raise questions and concerns. Rather, the writing is required in order to impress upon clients the seriousness of the decision the client is being asked to make and to avoid disputes or ambiguities that might later occur in the absence of a writing."). But in the context of rule 32:1.8, an attorney engaging in a business transaction with a client must first obtain "informed consent, in a writing signed by the client, to the essential terms of the transaction." *Id.* r. 32:1.8(a)(3). Thus, the writing must include, at a minimum, the essential terms to which the client is making an

informed consent. *See also In re Kahn*, 829 S.E.2d 344, 346 (Ga. 2019) (per curiam) (characterizing Georgia's identical version of rule 32:1.8(a) as requiring "client's written consent to the essential terms of the transactions"); *In re Conduct of Spencer*, 330 P.3d 538, 541 (Or. 2014) (en banc) (per curiam) (holding Oregon's identical version of rule 32:1.8(a) requires client to "consent[] in a signed writing to the transaction's essential terms and the role that the lawyer will play in the transaction").

In the context of this loan transaction between an attorney and his client, the essential terms include material details about the purpose and security for the loan known to Willey but withheld from Midwest. *See Lynch*, 901 N.W.2d at 507 (concluding attorney who "did not convey the full extent of his financial distress to the Bells" in a loan transaction with his client violated rule 32:1.8(a)'s informed consent requirements). Willey did not disclose to Midwest that its funds would be used in an unsecured and risky foreign transaction in which Catalyst had no experience. Nor did Willey disclose that Catalyst itself had no other funds, or source of funds, to repay Midwest in the event its venture with Ramis did not pan out. Essential terms of the secured loan also include Willey's contemporaneous knowledge that Wild's personal guarantee and the pledged interest in The IDEA Group would be essentially valueless to Midwest in the event Ramis failed to repay Catalyst and Catalyst failed to repay Midwest. The consent and waiver was woefully deficient in meeting Willey's disclosure requirements, and we agree with the commission that he violated rule 32:1.8(a).

As noted above, when an attorney represents the client in a transaction in which the attorney also has an interest, rule 32:1.7(b)(4) requires the additional disclosure of "the risks associated with the lawyer's dual role as both legal adviser and participant in the transaction, such as the risk that the lawyer will structure the transaction or give legal advice in a way that favors the lawyer's interests at the expense of the client." Iowa R. Prof'l Conduct 32:1.8 cmt. [3]. The consent and waiver identified those general risks, and Kaeding represented that he had been fully informed and counseled to seek independent legal advice. Unlike rule 32:1.8(a)(3), rule 32:1.7(b)(4) does not expressly require the essential terms of the transaction to be disclosed in writing in obtaining the client's informed consent. Our conclusion that Willey violated the disclosure requirements of rule 32:1.8(a) makes a separate discussion of whether the disclosures also violated rule 32:1.7(b)(4) largely academic. In any event, the consent and waiver satisfied Willey's obligation to confirm in writing Midwest's informed consent to Willey's dual representation required by rule 32:1.7(b)(4).

Finally, we agree with the commission's conclusion that the Board failed to prove Willey violated rule 32:1.7(a)(1) or (2) in his representation of Wild, a conclusion the Board does not challenge. The commission found much of Wild's testimony lacked credibility and Wild, a self-professed experienced and international investor, was well aware of the risks of entering into the Ramis deal, a deal he brought to Willey, and the accompanying promissory notes with Midwest and Laurus. In March 2007, Wild executed a consent and waiver agreement drafted by Willey acknowledging he had been advised of the rules

governing conflicts of interest in business dealings between a client and his attorney, including loans between his current or future entities and Willey, had evaluated the situation, and consented to Willey's continued representation. At the hearing, Wild acknowledged executing the waiver and testified he was fully aware that he was personally guarantying the Laurus and Midwest notes. Wild had previously signed personal guarantees in transactions involving Willey, some of which he had been required to perform. Therefore, Wild was reasonably informed of both the arrangement between him and Willey and the risks involved. Willey did not violate rule 32:1.7(a)(1) or (2) in his representation of Wild.

**C. Iowa Rule of Professional Conduct 32:8.4(c).** Rule 32:8.4(c) prohibits an attorney from "engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation." Iowa R. Prof'l Conduct 32:8.4(c). The Board must prove the attorney "acted with 'some level of scienter' rather than mere negligence." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Beauvais*, 948 N.W.2d 505, 515 (Iowa 2020) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Meyer*, 944 N.W.2d 61, 69 (Iowa 2020)). We must determine "whether the effect of the lawyer's conduct is to mislead rather than . . . inform." *Meyer*, 944 N.W.2d at 69 (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Noel*, 923 N.W.2d 575, 588 (Iowa 2019)). This situation may occur when an attorney "fail[s] to disclose a material fact." *Stoller*, 879 N.W.2d at 214.

Violations of rule 32:8.4(c) are especially serious in nature because "[h]onesty is necessary for the legal profession to function." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Haskovec*, 869 N.W.2d 554, 560 (Iowa 2015) (citing *Iowa Sup.*

*Ct. Bd. of Pro. Ethics & Conduct v. Lane*, 642 N.W.2d 296, 300 (Iowa 2002)); *see also Iowa Sup. Ct. Bd. of Pro. Ethics & Conduct v. Hohenadel*, 634 N.W.2d 652, 656 (Iowa 2001) ("Given the importance of honesty in our profession, we have stated that misrepresentation by a lawyer, 'constitutes a grave and serious breach of professional ethics,' and generally results 'in a lengthy suspension of the license to practice law.' " (quoting *Iowa Sup. Ct. Bd. of Pro. Ethics & Conduct v. Stein*, 603 N.W.2d 574, 576 (Iowa 1999))). On this issue, we have stated:

> Fundamental honesty is the base line and mandatory requirement to serve in the legal profession. The whole structure of ethical standards is derived from the paramount need for lawyers to be trustworthy. The court system and the public we serve are damaged when our officers play fast and loose with the truth.

*Hohenadel*, 634 N.W.2d at 656 (quoting *Comm. on Pro. Ethics & Conduct v. Bauerle*, 460 N.W.2d 452, 453 (Iowa 1990)).

Attorneys may violate both rule 32:1.8(a) and 32:8.4(c) when they do not reveal their interest in a business transaction to a client. *See Iowa Sup. Ct. Bd. of Pro. Ethics & Conduct v. Jones*, 606 N.W.2d 5, 6, 9 (Iowa 2000) (en banc) (per curiam) (holding the former version of rule 32:8.4(c) was violated in part because Jones failed to disclose that the transaction was very risky, and in part because he had failed to reveal he had taken a contingent interest in the transaction). A similar scenario presented itself in *Iowa Supreme Court Attorney Disciplinary Board v. Wright*, where an attorney utilized funds from five clients to assist another client obtain what he believed was an inheritance from a cousin in Nigeria. 840 N.W.2d at 297–98. Wright failed to inform his clients that he had a pecuniary interest in the transaction. *Id.* at 301–02. We found that Wright's

conduct in the loan transaction violated both rule 32:1.8(a) and rule 32:8.4(c). *Id.*

The Midwest waiver contained a material misrepresentation. Willey represented that a conflict may arise due to a loan that may be made by Midwest to Catalyst, in which Willey anticipated "owning an undetermined percentage of at some[ ]time in the future." At the time, Willey, through Orion's Pride, already owned a 50% interest in Catalyst. Distorting this fact into a future anticipated interest amounted to more than mere negligence or incompetence. Willey knew he had a duty to disclose interests in the transaction, evidenced by the language he included in the waiver. He also knew that he had a present interest in Catalyst, as he was the one who set up the company and the other companies making up Catalyst. For the forgoing reasons, we hold Willey violated rule 32:8.4(c).

**IV. Sanctions.**

"There is no standard sanction warranted by any particular type of misconduct. Though prior cases can be instructive, the sanction warranted in a particular case must be based on the circumstances of that case." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Hier*, 937 N.W.2d 309, 317 (Iowa 2020) (citation omitted) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Cannon*, 821 N.W.2d 873, 880 (Iowa 2012)). Nonetheless, "[w]e seek to 'achieve consistency with prior cases when determining the proper sanction.'" *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Newport*, 955 N.W.2d 176, 184 (Iowa 2021) (alteration in original) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Crotty*, 891 N.W.2d 455, 466 (Iowa 2017)).

We consider several factors in setting a sanction, including,

> [t]he nature of the violations, the attorney's fitness to continue in the practice of law, the protection of society from those unfit to practice law, the need to uphold public confidence in the justice system, deterrence, maintenance of the reputation of the bar as a whole, and any aggravating or mitigating circumstances.

*Iowa Sup. Ct. Att'y Disciplinary Bd. v. Noel*, 933 N.W.2d 190, 205 (Iowa 2019) (alteration in original) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Turner*, 918 N.W.2d 130, 152 (Iowa 2018)).

Willey argues that if we find he violated any rules, we are limited to ordering, at most, a public reprimand because the conduct at issue here occurred before his prior suspension. The Board maintains that Willey's conduct supports a thirty-day suspension because, had we been equipped with the facts of this disciplinary proceeding at the time of Willey's prior proceeding, we would have suspended him for longer than sixty days.

**A. Review of Analogous Cases.** Prior discipline is generally considered an aggravating circumstance; we expect attorneys to learn from prior mistakes and up the disciplinary ante when they don't. On occasion, however, events giving rise to disciplinary proceedings against an attorney reach the commission at different times and out of order. When a subsequent disciplinary proceeding is premised on earlier events, the attorney obviously could not have learned from the prior discipline. That said, we do consider whether we would have given the attorney a stricter sanction had we known all of the conduct. *See Iowa Sup. Ct. Att'y Disciplinary Bd. v. Tindal*, 949 N.W.2d 637, 644 (Iowa 2020) ("We must determine the sanction for Tindal's conduct resulting in default notices in

thirteen appeals during 2018–19, mindful that nine of those preceded his October 2018 public reprimand for default notices in sixteen appeals during 2016–17."); *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Moorman*, 729 N.W.2d 801, 806 (Iowa 2007) (reasoning that had we been aware of the conduct that was the subject of the disciplinary proceeding at the time of the previous decision, "it is unlikely this conduct would have caused us to suspend Moorman's license for longer than two years"); *Iowa Sup. Ct. Bd. of Pro. Ethics & Conduct v. D'Angelo*, 652 N.W.2d 213, 215 (Iowa 2002) (discussing whether knowledge of facts in current proceeding would have caused the court to enlarge D'Angelo's suspension).

Willey suggests an attorney cannot receive an enhanced sanction for conduct occurring prior to a previous disciplinary action. There is no such blanket rule. In past cases, we have refrained from enhancing the sanction due to the specific facts, such as where enhancement of the sanctions would not have deterred conduct and protected the public or the attorney had already been sufficiently sanctioned. *See, e.g.*, *Tindal*, 949 N.W.2d at 644 (reasoning that given Tindal's nearly unblemished disciplinary history in 2018, he still would have received a public reprimand for the series of default notices with no client harm); *Moorman*, 729 N.W.2d at 806 (imposing a public reprimand when Moorman had already been suspended for two years and remained suspended at the time of the second proceeding); *D'Angelo*, 652 N.W.2d at 215 (concluding it was not necessary to increase the quite lengthy suspension currently in force).

In fact, we have suspended attorneys although they were previously suspended for similar violations where the facts warranted a longer suspension. In *Iowa Supreme Court Attorney Disciplinary Board v. Ireland,* an attorney had previously been suspended because of neglect. 748 N.W.2d 498, 503 (Iowa 2008) (per curiam). As in this case, the attorney was subsequently brought before the commission for similar violations based on conduct that occurred before the earlier suspension. *Id.* In that case, multiple aggravating circumstances were identified in the second proceeding, including harm to Ireland's clients, misrepresentations to the Board and commission about whether he was hired to probate the estate, and prior discipline. *Id.* Given the aggravating factors, we suspended his license for another six months to ensure we promoted the public confidence in the justice system and maintenance of the reputation of the bar as a whole. *Id.*

Generally, sanctions in our conflicts cases range from a public reprimand to a four-month suspension. *See Marks,* 814 N.W.2d at 541–42 (concluding a public reprimand was appropriate where there was no client harm); *Qualley,* 828 N.W.2d at 293–94 (suspending two attorneys' licenses for sixty days for violations of rules 32:1.7 and 32:1.8); *Wagner,* 599 N.W.2d at 731 (imposing a three-month suspension when attorney violated conflicts rules by representing a buyer and seller with an insufficient waiver in a single real estate transaction). We typically impose a longer suspension in conflicts cases where there are multiple violations and multiple clients involved. *See Hamer,* 915 N.W.2d at 305–06, 325–26 (imposing a six-month suspension when Hamer violated conflict of interest rules

related to several loan transactions between multiple clients without adequate conflict of interest disclosures and informed consent, distinguishing *Willey I*'s sixty-day suspension as involving only one conflict of interest transaction); *Wright,* 840 N.W.2d at 303–04 (suspending an attorney for twelve months after he convinced several clients to lend money to another client for a loan scam when attorney also had a financial interest in the transaction and failed to make a competent analysis of the transaction).

In addition, "[t]he range of sanctions imposed upon attorneys engaging in representation of clients in violation of conflict of interest rules [coupled with] engaging in misrepresentation or deceit resulting in a client's financial loss has spanned a continuum from a suspension of two months to a revocation of a license to practice law." *Wright*, 840 N.W.2d at 303; *see also Jones*, 606 N.W.2d at 9 (imposing two-month suspension); *Comm. on Pro. Ethics & Conduct v. Hall,* 463 N.W.2d 30, 35–36 (Iowa 1990) (citing cases imposing sanctions up to and including revocation depending on nature and extent of violations). We consider these factors in assessing whether to impose an additional suspension in light of Willey's prior sixty-day suspension.

**B. Mitigating and Aggravating Factors.** Before we determine the appropriate sanction, we must consider any mitigating or aggravating factors. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Marzen*, 949 N.W.2d 229, 243 (Iowa 2020); *Stoller*, 879 N.W.2d at 220–21. There are several in this case.

While Willey was somewhat vague in some of his testimony, the commission found him fully cooperative with the Board's investigation, which we

consider a mitigating factor. *Willey I,* 889 N.W.2d. at 658 (citing *Qualley*, 828 N.W.2d at 294). Willey had no prior discipline before 2017, which we also consider a mitigating factor. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Bartley*, 860 N.W.2d 331, 339 (Iowa 2015). Finally, Willey has engaged in extensive community service, another mitigating factor. *Willey I*, 889 N.W.2d. at 658 (citing *Stoller*, 879 N.W.2d at 221).

Notwithstanding the mitigating factors, we must consider the aggravating factors involved in the Catalyst-Midwest transaction. We consider the experience of an attorney to be an aggravating factor. *Bartley*, 860 N.W.2d at 339. Willey was an experienced attorney and CPA, who specialized in tax and business law and who had been practicing for many years. *Willey I*, 889 N.W.2d at 658. Similar to *Willey I*, here, the structure of the investment was "questionable from the beginning with an outrageous promise of a return on the investment." *Id.* In *Willey I* we stated that no one could "reasonably counsel a client that [the transaction] was a sound investment opportunity." *Id.* The same applies here. During the hearing, neither Willey nor Wild could satisfactorily explain how the transaction with Ramis would work. That Willey has engaged multiple clients in dubious investment schemes is troubling.

We also consider the separate harm involved in this case. *See Iowa Sup. Ct. Att'y Disciplinary Bd. v. Weiland*, 885 N.W.2d 198, 215–16 (Iowa 2016) (discussing that client suffered significant harm when attorney did not return the client's retainer until after new counsel was retained and the divorce was finalized); *Iowa Sup. Ct. Bd. of Pro. Ethics & Conduct v. Jay,* 606 N.W.2d 1, 4

(Iowa 2000) (en banc) ("[M]ore severe discipline is warranted when the ethical violations cause harm to clients . . . ."); *Comm. on Pro. Ethics & Conduct v. Baker*, 269 N.W.2d 463, 466 (Iowa 1978) (en banc) (holding that economic harm aggravates a conflict of interest violation). To date, Midwest has not received repayment of the $200,000 loan. The only evidence of any party repaying Midwest is Willey's testimony that he personally paid Midwest $15,000. We reject Willey's argument that because Midwest's principal owner, Nate Kaeding, had a successful career in the NFL, Midwest has not faced financial harm. The fact remains that Midwest has not been repaid the full amount of its loan.

We also consider "persistence . . . in perpetuating [a] falsehood . . . a remarkable aggravating factor." *Willey I*, 889 N.W.2d at 658 (first omission and alteration in original) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Barnhill*, 885 N.W.2d 408, 424 (Iowa 2016)). In *Willey I*, Willey repeatedly represented to Wieniewitz that his payment was forthcoming "soon," whether in a few days or the next week. *Id.* The same conduct occurred here as Willey communicated with Kaeding over a three-and-a-half-year period about transactions that would allegedly lead to Catalyst's imminent repayment of the Midwest loan. As in the Wieniewitz situation, Willey's promises never materialized.

**C. Appropriate Sanction.** Based on Willey's violations and the aggravating and mitigating factors in this case, we agree with the Board that had we known these facts at the time of the first proceeding, we would have imposed a longer suspension. Willey's actions involved separate ethical violations against separate clients, and displayed a pattern of soliciting loans from clients for David

Wild's businesses without fully disclosing the true nature of the transactions. Again, we typically impose a longer suspension in conflicts cases where there are multiple violations and clients involved. *See Hamer*, 915 N.W.2d at 305–06, 325–26 (imposing a six-month suspension when Hamer violated conflict of interest rules related to several loan transactions between multiple clients). Willey's willingness to engage his clients in questionable investments—without disclosing the essential terms of the transactions to allow his clients to make an informed decision—was apparently not a one-time aberration. Had we known of Willey's repeated conduct, we likely would have imposed a stricter sanction. Therefore, we agree with the commission's and Board's recommendations that Willey's license should be suspended for thirty days.

**V. Disposition.**

We suspend Bruce A. Willey's license to practice law with no possibility for reinstatement for thirty days. This suspension applies to all facets of the practice of law. He must comply with the notification requirements in Iowa Court Rule 34.24. We tax the costs of this action to Willey under Iowa Court Rule 36.24(1).

**LICENSE SUSPENDED.**